**REVERSE and RENDER in part; AFFIRM in part; Opinion Filed June 20, 2014.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-11-01303-CV

## ROBERT L. MCCULLOUGH AND JULIA T. MCCULLOUGH, Appellants

### V.

## SCARBROUGH, MEDLIN & ASSOCIATES, INC. AND SCARBROUGH, MEDLIN & ASSOCIATES FINANCIAL SERVICES, INC., Appellees

### On Appeal from the 416th Judicial District Court
### Collin County, Texas
### Trial Court Cause No. 416-02008-2009

## OPINION

Before Justices FitzGerald, Lewis, and Brown[1]
Opinion by Justice Brown

Robert L. McCullough[2] and Julia T. McCullough appeal from the trial court's judgment rendered on a jury verdict in favor of Scarbrough, Medlin & Associates, Inc. and Scarbrough, Medlin & Associates Financial Services, Inc. (collectively, SMA) on SMA's claims for breach of contract, breach of fiduciary duty, fraud, and civil theft against McCullough and their equitable claim of money had and received against both McCullough and his wife, Julia McCullough. We reverse that portion of the trial court's judgment awarding SMA statutory damages and

---

[1] The Honorable Mary L. Murphy, Retired Justice, was a member of the panel at the time this case was submitted, but due to her resignation from this Court on June 7, 2013, she did not participate in deciding this case. She was replaced on the panel by Justice Ada E. Brown in accordance with the appellate rules. *See* TEX. R. APP. P. 41.1(a).

[2] Because this appeal primarily concerns the conduct of Robert McCullough and his contractual relationship with appellees, the use of "McCullough" throughout this opinion refers to Robert McCullough. We refer to appellants jointly as "the McCulloughs."

attorneys' fees and render judgment SMA cannot recover those amounts. We affirm the trial court's judgment in all other respects.

## I. BACKGROUND

### A. SMA's business and McCullough's employment at SMA

Scarbrough, Medlin & Associates, Inc. is a commercial insurance agency. The firm is owned by brothers Don and Rod Medlin, who are the only principals of the firm. Don Medlin is the firm's president, and because he testified on behalf of SMA at trial, we will refer to him as "Medlin."

In November 1998, the Medlins hired McCullough to create a financial services division of the firm and serve as the division's president. Financial services encompassed employee benefit and retirement plans, and the addition of the division expanded the firm's business beyond selling commercial property and casualty insurance. Although the financial services division lost money the first few years, it developed into a viable part of the firm, at which time the Medlins formed Scarbrough, Medlin & Associates Financial Services, Inc. for the purpose of putting the division into a separate corporate entity. That entity was incorporated in 2005 but remains a shell corporation.

McCullough's responsibilities as president of the financial services division included running the division, hiring employees, managing and overseeing the products sold, sales training, and development of the support staff. As compensation, McCullough received a salary plus one third of the division's profits at the end of the year as a bonus. McCullough also received other benefits, including use of a corporate American Express card, a car allowance, and reimbursement for his expenses.

SMA generates income either by charging a fee to the client for negotiating the premiums for the client's insurance program or collecting a commission from the insurance carriers based

on the insurance products sold to SMA's clients. The amount of the commission ranges from five to fifteen percent depending on the line of coverage sold. For most of the products sold by SMA, the commissions earned were to be paid by the insurance carrier to SMA, not to the individual agent who sold the insurance. For any insurance product that involved the sale of securities, like 401(k) and retirement plans, however, the commission could be received only by one who holds a Series 7 license. Because McCullough held a Series 7 license, Medlin knew that commissions for those products would be paid to McCullough directly. In turn, McCullough would pass on the commissions to SMA.

**B. Problems with accounting for financial services commissions**

In 2006, Medlin learned that SMA was receiving commission-based income from the sale of financial services products by personal checks from McCullough and not by payments from the insurance carriers. That is, McCullough changed the payment instructions with various carriers and directed those carriers to pay him the commissions earned (as opposed to paying SMA) not only for Series 7 products but also for other financial services products. The commission statements would go to McCullough's home address. After McCullough received the commission check from the carrier, he would either endorse the check to SMA or deposit the money into his personal bank account and issue a personal check to SMA. He also received electronic fund transfers of commission payments from the insurance carriers into his personal bank account. SMA did not give McCullough permission to handle financial services commissions in this manner, and excluding the products that required a Series 7 license, Medlin could think of no valid business reason for this practice. Medlin also was concerned because the practice affected the accuracy of SMA's financial information for tax-reporting purposes and the firm's cash flow. With this practice, SMA did not have access to its cash until SMA received the

payment from McCullough, yet SMA paid all expenses that accompanied running the financial services division.

Beginning in 2006 and continuing through 2008, SMA's accounting department tried to reconcile the accounting for financial services commissions. As part of the reconciliation, the department requested bank and commission statements from McCullough and pressed him to provide bank routing numbers so commission payments could be re-wired from McCullough's bank account to SMA's account. McCullough did not provide the requested information; rather, he offered "plausible excuses" for the delay. And despite receiving communications about SMA's concerns over the accounting and commission practices (including SMA's repeated requests for online access to the commissions deposited into McCullough's personal bank account), McCullough continued the practice and added another carrier to the list of carriers that deposited funds into his personal bank account, which SMA learned about in September 2008.

Around that same time, SMA's outside CPA, Robert Wilson, became involved in the process to resolve the financial services accounting issues and met with McCullough at SMA's request on October 31, 2008. During the meeting, Wilson discussed with McCullough SMA's need to obtain financial records from him for the purpose of reconciling SMA's income. Wilson gave McCullough an agenda listing several requests for McCullough's records and information, including requests for McCullough to provide all bank statements from 2006 through October 31, 2008 and access codes to the account in which McCullough deposited commissions related to the sale of securities. Wilson also asked McCullough to change the payment structure for commissions paid by all insurance carriers so that the commission checks would be payable to SMA. Wilson was particularly concerned about the fact that business funds were being deposited into McCullough's joint account with his wife. Wilson asked McCullough to close that account and open a separate business account that both McCullough and SMA could access.

–4–

McCullough agreed to close the joint account and provide the bank statements. Wilson gave McCullough a deadline of November 15, 2008 to fulfill the requests.

From November 7 through the end of December, Wilson asked McCullough for updates on the requests, emphasizing the need for McCullough to provide the bank statements for the reconciliation. McCullough responded with assurances of "progress" and gave Wilson some partial printouts from bank websites. According to Wilson, he never received the specific documents requested.

In early January 2009, McCullough announced he was leaving SMA. At a subsequent meeting attended by the Medlins, their attorney, McCullough, and his attorney, Medlin learned that McCullough not only was resigning from SMA but also he was taking the financial services division with him, including several of the employees, and selling the business to a competitor, Frost Insurance Agency, Inc. The Medlins considered suing McCullough, but because a lawsuit would necessarily involve joint clients, they decided to negotiate an agreement with McCullough.

## C. The Separation Agreement between SMA and McCullough

As a result of the negotiations, SMA and McCullough entered into a letter agreement, dated February 27, 2009 (the "Separation Agreement"). The Separation Agreement terminated McCullough's employment with SMA effective February 28, 2009 and established that all commissions and other revenues associated with products sold by McCullough or the financial services division through the termination date belonged to SMA. The agreement also addressed the sale of the financial services book of business to Frost. Under those provisions, McCullough and SMA agreed to a 50/50 split of all payments received from Frost for the sale. The parties received the first check for $375,000 from Frost the day after the sale, and to finish the sale, Frost paid monthly checks over a period of eighteen months. SMA also agreed to release the

financial services employees from any non-compete obligations so that those employees could be employed by Frost.

The Separation Agreement also outlined a mechanism for resolving the accounting dispute over financial services commissions between SMA and McCullough. Specifically, the agreement provided that "SMA's CPA will make a determination of any commissions or other revenues associated with all insurance products sold by McCullough or the financial services division of SMA that have been received by McCullough through the Termination Date and not remitted to SMA." The agreement refers to the amount of commissions and revenues unremitted by McCullough and due SMA as the "Recovered Premiums." The Recovered Premiums were to be reduced by any sums SMA owed McCullough for expense reimbursement or the one-third distribution of profits from the sale of insurance products by McCullough or the division. The process of calculating the amount of Recovered Premiums less the amount owed to McCullough is called the "CPA Determination." Before the Separation Agreement was signed, SMA estimated that McCullough owed SMA about $137,000 in unremitted commissions. But in the agreement, the parties capped the amount McCullough would be required to pay at $75,000.

The parties agreed to cooperate in good faith to accomplish this accounting. As part of that cooperation, McCullough promised to "promptly" provide all information, records, and documents identified in an exhibit to the agreement (the "Due Diligence Items") that were needed for the CPA Determination. The agreement contemplated a notice and cure period related to McCullough's cooperation in providing the Due Diligence Items. If McCullough did not promptly provide or act upon the items, SMA could send McCullough a written non-compliance notice that details the Due Diligence Items not provided or fulfilled. McCullough then had thirty days from the date he received the notice to comply; if he did not, he had five

days to pay the negotiated cap of $75,000. SMA agreed to bear the cost of the CPA Determination, which was to be completed by August 31, 2008.

The Separation Agreement also contained a release provision in which SMA and McCullough agreed to "mutually release each other from any claims, demands, causes of action and liabilities, known or unknown, either has against the other based on any facts, events, transactions and occurrences through February 29, 2009." The parties' mutual release, however, excepted out "the obligations or outstanding issues or claims" provided in the Separation Agreement.

**D. Events leading to suit**

Less than two weeks after signing the Separation Agreement, Wilson sent McCullough a non-compliance notice, detailing the Due Diligence Items that McCullough had not yet provided as required by the Separation Agreement. Wilson reminded McCullough in the notice that he had thirty days to provide the requested items and his failure to do so within the thirty-day period would trigger his obligation to pay SMA $75,000. McCullough's counsel responded by letter dated April 9, 2009, stating that McCullough had provided the requested bank statements during the negotiations. Counsel also attached to the response a two-page printout of McCullough's March 2009 bank activity for one account. The printout from the bank website shows that McCullough received sums from four insurance carriers during that month, even though McCullough was required under the Due Diligence Items to contact the carriers regarding outstanding payments due to SMA in accordance with the terms of the Separation Agreement.[3]

SMA disputed McCullough's contention that he provided the requested bank statements by letter from counsel dated April 30, 2009. Counsel listed the specific Due Diligence Items that

---

[3] SMA also had flagged this practice beginning in 2006, asking McCullough why commission checks from certain carriers were being deposited directly into McCullough's bank account and whether the carriers were "requiring [SMA] to receive [their] commission that way."

–7–

had not been delivered within the thirty-day cure period and asserted that McCullough's failure to provide the materials constituted a breach of the Separation Agreement. SMA reminded McCullough that he had the right under the Separation Agreement to limit his future liability by paying SMA $75,000, but because he did not do so, SMA demanded that McCullough pay the full amount of the commissions and other revenue that McCullough collected but did not remit to SMA. The firm threatened to file suit against McCullough to recover the unremitted money.

**E. SMA files this lawsuit against the McCulloughs**

McCullough did not pay SMA $75,000 or any amount to reconcile what he owed SMA. Nor did McCullough provide any of the remaining Due Diligence Items identified by Wilson and requested in the non-compliance notice and the April 30 demand letter. So, SMA filed this lawsuit against McCullough and his wife on May 21, 2009.

In their original petition, SMA alleged McCullough had deposited commissions and other revenue belonging to SMA into bank accounts maintained by him and Julia and when SMA asked McCullough to return the money, McCullough did not do so. SMA asserted a breach of contract claim against McCullough based on his failure to fulfill his obligations under the Separation Agreement and an equitable claim for money had and received against the McCulloughs, alleging they were in possession of monies that belonged to SMA. SMA asked the trial court to place a constructive trust on all monies received by the McCulloughs that belonged to SMA and the proceeds and assets acquired with the monies. In an amended petition, which was the live pleading at the time of trial, SMA raised additional claims against McCullough for breach of fiduciary duty, civil theft under the Texas Theft Liability Act, and fraud. SMA sought actual, statutory, and punitive damages and the equitable remedies of disgorgement, forfeiture, constructive trust, and restitution under the theory of unjust enrichment. SMA also sought to recover their attorneys' fees and costs.

The McCulloughs specially excepted to all of SMA's pleaded claims, except the breach of contract claim, asserting, among other things, that based on the mutual release contained in the Separation Agreement, SMA's claims are limited to breach of that agreement. They also asserted various affirmative defenses, including release, and counterclaims for breach of contract and declarations that the Separation Agreement limited SMA's causes of action to breach of the agreement and McCullough's liability to $75,000. SMA generally denied the McCulloughs' counterclaims and responded that declaratory relief is not necessary because the dispute would be resolved through SMA's breach of contract claim.

**F. The jury returns a verdict for SMA.**

The case was tried to a jury for four days. After both sides rested, the McCulloughs moved for instructed verdict on all claims, except the claim against McCullough for breach of the Separation Agreement. McCullough again argued that based on the mutual release provision in the agreement, the only viable claim against him is one for breach of that agreement and all other claims are precluded as a matter of law. He also maintained that (1) SMA's damages are limited to those specified by the Separation Agreement, (2) SMA cannot recover the fees generated by Wilson because SMA agreed to bear that cost as stated in the agreement, and (3) SMA cannot recover the fee paid to McCullough from a particular client because that fee is outside the scope of the Separation Agreement. Julia argued that because she is not a party to the Separation Agreement, which controls the rights and obligations of the parties, SMA's claims against her should be denied.

The trial court denied the motion for instructed verdict and submitted the case to the jury, which returned a verdict in favor of SMA on all claims against McCullough individually and the claim for money had and received against both McCullough and Julia. The parties filed post-judgment motions: SMA filed a motion for entry of the judgment, and the McCulloughs filed

amended motions for judgment notwithstanding the verdict, a new trial, and an election of remedies. After a hearing on those motions, the trial court denied the McCulloughs' motions and signed a final judgment on July 14, 2011 awarding SMA the following sums to be recovered from McCullough: (1) $138,572.20 in actual damages plus pre-judgment interest, (2) $700,000 in punitive damages, and (3) $201,105 as an equitable forfeiture and disgorgement remedy, and awarding SMA $35,371.10 in damages plus pre-judgment interest to be recovered from McCullough and Julia, jointly and severally. The court also awarded SMA their attorneys' fees in the amount of $172,438.53 and placed a constructive trust on five of the McCulloughs' bank accounts for certain amounts. The judgment ordered that the McCulloughs take nothing on their counterclaims, including their requests for declaratory judgment.

## II. DISCUSSION

The McCulloughs raise seven issues on appeal. In their first issue, they argue that we should reverse the judgment against them and render judgment that SMA take nothing on their extra-contractual claims for fraud, breach of fiduciary duty, and civil theft and equitable claim for money had and received because those claims are barred as a matter of law by the mutual release provision in the Separation Agreement. They also maintain as a part of their first issue that the very existence of the Separation Agreement precludes SMA's claim for money had and received and remedy of unjust enrichment and the disclaimer-of-reliance provision in the agreement negates an element of SMA's fraud claim. McCullough also challenges the legal and factual sufficiency of the evidence supporting the jury's answers related to his breach of the Separation Agreement and SMA's claims for accounting and attorneys' fees (Issues Three and Four). Alternatively, McCullough contends there is legally and factually insufficient evidence to support the jury's answers on SMA's claims for fraud, breach of fiduciary duty, and civil theft and the jury's award of equitable disgorgement and punitive damages (Issues Two and Six). The

–10–

McCulloughs further argue in the alternative that the trial court erred in entering a judgment on all of SMA's claims in violation of the one-satisfaction rule (Issue Five). And they contend the trial court erred in entering a turnover order in the judgment (Issue Seven). We begin with the McCulloughs' arguments related to whether the mutual release operates to bar most of SMA's claims.

## A. Did the mutual release bar SMA's extra-contractual and equitable claims?

The McCulloughs argue in their first issue that they are entitled to judgment as a matter of law on SMA's extra-contractual and equitable claims because these claims are barred under the broad language of the mutual release provision contained in the Separation Agreement. Although the McCulloughs do not state the ruling from which this issue arises, we construe their argument as raising a challenge to the trial court's denial of the motion for instructed verdict and amended motion for judgment notwithstanding the verdict. *Cf. United Parcel Serv., Inc. v. Tasdemiroglu*, 25 S.W.3d 914, 916 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) (matter of law point preserved in motion for directed verdict or JNOV).

### 1. Standard of Review

An instructed verdict for a defendant may be proper when (1) a plaintiff fails to present evidence raising a fact issue essential to the plaintiff's right to recover, or (2) the plaintiff admits or the evidence conclusively establishes a defense to the plaintiff's cause of action. *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.* 29 S.W.3d 74, 77 (Tex. 2000); *see also Byrd v. Delasancha*, 195 S.W.3d 834, 836 (Tex. App.—Dallas 2006, no pet.) (directed verdict warranted when evidence is such that no other verdict can be rendered and movant is entitled to judgment as a matter of law). Similarly, a judgment notwithstanding the verdict is proper when (1) the evidence is conclusive and one party is entitled to judgment as a matter of law, or (2) a legal principle precludes recovery. *Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex. 2003) (per curiam);

*John Masek Corp. v. Davis*, 848 S.W.2d 170, 173 (Tex. App.—Houston [1st Dist.] 1992, writ denied).

When, as here, the ruling on the motion for instructed verdict is based on a question of law, we review that aspect of the ruling under a de novo standard of review. *COC Servs., Ltd. v. CompUSA, Inc.*, 150 S.W.3d 654, 662 (Tex. App.—Dallas 2004, pet. denied). "A motion for judgment [notwithstanding the verdict] based on a legal principle is appropriately granted when it is conclusively established that recovery is precluded even though all the allegations are proven." *Pitts & Collard, L.L.P. v. Schechter*, 369 S.W.3d 301, 320 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

## 2. Applicable Law

A release is a contractual arrangement that operates as a complete bar to any later action based upon matters covered in the release. *Schomburg v. TRW Vehicle Safety Sys., Inc.*, 242 S.W.3d 911, 913 (Tex. App.—Dallas 2008, pet. denied). A release is subject to the rules of contract construction, including the rules related to ambiguity. *Leighton v. Rebeles*, 399 S.W.3d 721, 725 (Tex. App.—Dallas 2013, no pet.); *D.R. Horton-Tex., Ltd. v. Savannah Props. Assocs., L.P.*, 416 S.W.3d 217, 226 (Tex. App.—Fort Worth 2013, no pet.). In construing a release, as with other contracts, our primary task is to determine the true intentions of the parties as expressed in the writing itself. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011). We must consider the entire writing in an effort to harmonize and give effect to the provisions of the contract so that none will be rendered meaningless. *Id.* Terms are given their plain, ordinary, and generally accepted meaning unless the instrument shows the parties used terms in a technical and different sense. *ECF N. Ridge Assocs., L.P. v. ORIX Capital Mkts., L.L.C.*, 336 S.W.3d 400, 407 (Tex. App.—Dallas 2011, pet. denied).

To release a claim effectively, the releasing instrument must "mention" the claim to be released. *Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 20 S.W.3d 692, 698 (Tex. 2000) (discussing *Victoria Bank & Trust Co. v. Brady*, 811 S.W.2d 931, 938 (Tex. 1991)). But the parties need not anticipate and identify each potential cause of action relating to the subject matter of the release. *Id.* Rather, "a valid release may encompass unknown claims and damages that develop in the future." *Id.* Further, the "mention" requirement does not bar general, categorical releases, but such releases are to be narrowly construed. *Brady*, 811 S.W.2d at 938; *see also Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 422 (Tex. 1984). We also construe releases in light of the facts and circumstances surrounding the execution of the release. *Brady*, 811 S.W.2d at 939. Claims not "clearly within the subject matter of the release" are not discharged, even if those claims exist at the time release was executed. *Id.* at 938.

### 3. The Mutual Release in the Separation Agreement

The stated purpose of the Separation Agreement was to evidence an agreement between SMA and McCullough "related to McCullough's separation from SMA and the sale of his benefits/financial services book of business to Frost." The mutual release is contained in paragraph 6 of the agreement:

> 6. **Mutual Releases.** Effective upon the payment to SMA of 50% of the purchase price to be paid by Frost at the closing of the sale of the Book, SMA, its subsidiaries, affiliates and their respective officers and directors on the one hand and McCullough on the other mutually release each other from any claims, demands, causes of action and liabilities, known or unknown, either has against the other based on any facts, events, transactions and occurrences through February 28, 2009, excepting the obligations or outstanding issues or claims provided herein.

The scope of the last line of the release, which excludes from the release "the obligations or outstanding issues or claims provided herein," is the focus of the parties' disagreement. The Separation Agreement does not define these terms.

**4. The Parties' interpretations of the release and exception clause**

The McCulloughs argue that all of SMA's claims (except the claim for breach of the Separation Agreement) arising out of the parties' employment relationship and existing at the time the agreement was signed are covered and barred by this broad release. They further argue the exception to the release does not alter the release of other extra-contractual or equitable claims, known or unknown to SMA at the time of the agreement. Rather, the McCulloughs assert the use of phrase "provided herein" dictates that we look to the express terms of the agreement itself to determine what "obligations," "outstanding issues," or "claims" were not included or encompassed in the release.

Looking to the terms of the Separation Agreement, they first explain that the agreement provides for certain "obligations," such as McCullough's obligation to provide the Due Diligence Items, the obligation to perform the CPA Determination, and the parties' obligations to cooperate in good faith to accomplish the accounting. They contend those contractual obligations are part of the exception and not released. In the same way, they explain that the agreement mentions certain "claims" that may occur in the future. For example, the agreement states that if McCullough rejects the CPA Determination and gives SMA written notice of the rejection within a certain period, "SMA shall have the right to bring suit against McCullough" for the amount of the unrecovered commissions and "such other damages and costs (including reasonable attorneys' fees) related thereto." In addition, the agreement contemplates that other "claims" could arise, such as a claim for breach of the agreement's non-compete or non-disparagement clauses, payment of monies due and owing under the agreement, or indemnification. The McCulloughs interpret these "claims" arising under the agreement as being excepted from the release.

Regarding the "outstanding issues" provided in the agreement, the McCulloughs maintain this term refers to "those matters still in controversy under the Separation Agreement." They assert that "the only issue in controversy" as evidenced by the terms of the agreement was the amount of any unremitted commissions—specifically, "the amount of commissions received by McCullough and owed to SMA, if any," after offsetting any amount owed to McCullough. They claim there is no dispute in the evidence that at the time the parties entered into the Separation Agreement, SMA knew (1) McCullough received commissions that belonged to SMA, (2) that he put the commissions into his personal bank account but did not remit the money to SMA, and (3) that the money he received included commissions from clients he failed to disclose to SMA. The McCulloughs explain that what the parties did not know was how much money was owed, and because they wanted to determine the amount, they entered into the Separation Agreement, which contains detailed accounting provisions for resolving the controversy over the amount.

The McCulloughs also assert the Separation Agreement as a whole supports the interpretation that the release bars SMA's extra-contractual and equitable claims. They point out that "nowhere in the Separation Agreement is there evidence of any intent to preserve claims independent from those arising under the Agreement." Instead, they claim the broad-form release encompasses "any claims . . . known or unknown . . . based on any facts, events, transactions and occurrences through February 28, 2009." They argue that to adopt an interpretation of the release as preserving the very claims SMA knew about at the time they signed the agreement would render the inclusion of the "known" claims language in the release meaningless. They contend that the inclusion of the broad-form release, in the absence of any language evidencing the parties' intent to preserve extra-contractual or equitable claims, negates these claims as a matter of law.

SMA responds that the McCulloughs' interpretation of the release as embracing SMA's extra-contractual and equitable claims renders the term "outstanding issues" in the exception to the release superfluous or meaningless. SMA agrees that the "obligations" provided in the agreement relate to the contractual promises or duties imposed by the agreement and the term "claims" means the claims that are provided in the agreement. SMA also appears to agree that the "outstanding issue" was the amount of money that was owed, or stated another way, the issue was "who owes who money." But SMA parts ways with the McCulloughs' interpretation of the term because SMA asserts the "outstanding issue" of how much money was owed is more than just a preserved contractual claim under the agreement. Rather, SMA contends the exception to the release carved out all claims related to the outstanding issue.

SMA contends that when you read the agreement as a whole and apply the plain meaning of the term, "outstanding issues" means "those issues addressed in the Agreement that were not immediately resolved therein." SMA explains that at the time the parties entered into the Separation Agreement, there were numerous issues between the parties—such as the termination of McCullough's employment, the ownership of the book of business and collection of commissions associated with the book through the termination date, the accounting for commissions collected but not remitted to SMA, and the sale of the book of business to Frost— that the agreement was meant to resolve. In particular, the accounting mechanism outlined in the agreement was supposed to resolve the issue related to the money that was owed. But SMA asserts the accounting mechanism failed when McCullough did not cooperate and deliver the Due Diligence Items necessary for the CPA Determination, leaving the issue of how much money was owed unresolved or "outstanding,'' and thus, the claims related to the "outstanding issues" unreleased.

SMA also contends the release is not a part of a "comprehensive settlement agreement" that expresses an intent to settle all disputes between the parties. Rather, the release is contained in a letter agreement that recites an intent to show an agreement between the parties related to two things: McCullough's separation from employment and the sale of the book of business to Frost. And because the release does not clearly express an intent to release the extra-contractual claims if the accounting mechanism fails, SMA maintains we should apply the rule that broad releases are to be narrowly construed and conclude the release does not bar these claims.

**5. Analysis**

Although the parties present conflicting interpretations of the release, neither party contends the provision is ambiguous. Of course, the question of whether an agreement is ambiguous is a question of law, and we may conclude an agreement is ambiguous even if the parties do not plead ambiguity or argue the agreement contains an ambiguity. *See Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983); *Hackberry Creek Country Club, Inc. v. Hackberry Creek Home Owners Ass'n*, 205 S.W.3d 46, 56 (Tex. App.—Dallas 2006, pet. denied). A writing or term is not ambiguous because it lacks clarity or the parties offer different interpretations. *DeWitt Cnty. Elec. Coop, Inc. v. Parks*, 1 S.W.3d 96, 100 (Tex. 1999). But if the language, after applying the relevant rules of contract construction, is susceptible to more than one reasonable interpretation, the contract contains an ambiguity and a fact issue exists as to the parties' intent. *Coker*, 650 S.W.2d at 394.

Our job in reviewing the trial court's denial of the McCulloughs' motion for instructed verdict and amended motion for judgment notwithstanding the verdict is to determine whether the McCulloughs, as movants, were entitled to judgment as a matter of law. To show their entitlement to judgment as a matter of law, the McCulloughs had to conclusively establish that SMA's extra-contractual and equitable claims were not viable because the claims were barred by

the mutual release provision in the Separation Agreement. *See Pitts & Collard*, 369 S.W.3d at 320; *see also Schindley v. Ne. Tex. Cmty. Coll.*, 13 S.W.3d 62, 65 (Tex. App.—Texarkana 2000, pet. denied) (JNOV appropriate when, as a matter of law, "the claim or defense presented is not viable and should never have been presented to the jury"). The trial court ruled against them on this issue, so to show reversible error, the McCulloughs had to show that no other verdict could be rendered because their interpretation of the release (as barring all claims except the claim for breach of contract) is reasonable and SMA's interpretation (that any claims related to the money were covered under the exclusion to the release) is unreasonable. If we agree that the McCulloughs' interpretation of the release is reasonable and SMA's interpretation is unreasonable, we would reverse the judgment against the McCulloughs and render judgment for them on SMA's extra-contractual and equitable claims because those claims would not be viable based on the release. But if we determine that SMA's interpretation is reasonable (regardless of whether the competing interpretation also is reasonable), the McCulloughs' challenge to the court's rulings fails because, at best, this created an ambiguity in the release, raising a fact question as to the parties' intent. A disputed question of fact prevents the McCulloughs from conclusively establishing their entitlement to judgment as a matter of law. *See Pitts & Collard*, 369 S.W.3d at 320.

Under the mutual release provision in paragraph 6, "outstanding issues" provided in the Separation Agreement were excluded from the release. According to the parties and as supported by the language in paragraph 3 of the agreement, the "outstanding issue" related to the parties' dispute over how much money was owed the other. To figure out the amount owed, the parties agreed to the accounting mechanism in paragraph 3, specifically, that SMA's CPA would determine the amount of commissions and other revenues received by McCullough but not remitted to SMA and reduce that amount by any money owed to McCullough.

–18–

SMA's position is that they released claims that were dealt with by the Separation Agreement and did not release claims that were not dealt with by the agreement and the exception language was put in the release to preserve SMA's ability to bring suit on the nature, character, and amount of the missing money if McCullough did not follow the agreement, which allowed him to limit his exposure. That is, under this interpretation, if the accounting does not happen, you go back to the exception to the release, which carves out from the release the "outstanding issues" provided in the agreement. And the claims related to the "outstanding issue"—here, the amount of money owed—remain because the agreed-upon procedure to resolve the issue failed.

This interpretation makes sense when we consider the language of the agreement and release with the facts and circumstances surrounding the execution of the release. *See Brady*, 811 S.W.2d at 939 (release to be construed in light of facts and circumstances surrounding release's execution). The success of the accounting depended on McCullough's promise in the agreement to cooperate in providing the Due Diligence Items necessary for the CPA Determination. The record shows that in the two years leading up to the execution of the Separation Agreement, SMA tried to complete an accounting of commissions for the financial services division and that McCullough had not cooperated with those efforts. Beginning in 2006, SMA made repeated requests for McCullough to provide bank statements and access to bank accounts and change payment instructions with the carriers. In response to those requests, McCullough offered partial printouts from his bank website or documents showing electronic fund transfers and otherwise dodged SMA's pleas with his excuses. When SMA finally pressed McCullough for the information, McCullough did not provide the materials, resigned, and announced he was taking the financial services division with him. Although both parties promised to cooperate to accomplish the accounting, the agreement appears to contemplate a

lack of cooperation only by McCullough; it states that "[s]hould McCullough fail to cooperate in providing and acting upon the Due Diligence Items promptly," SMA will provide written notice of the failure from which time McCullough will have thirty days to cure or pay $75,000.

The record also shows that in January 2009, after McCullough told the Medlins he was resigning but before the parties signed the Separation Agreement, McCullough's attorney communicated a calculation done by McCullough that reflected an estimate of about $23,000 in unreconciled commissions. Medlin understood the calculation to be an identification that McCullough knew he owed money to SMA. But McCullough did not believe the estimate showed he owed SMA money; he thought a reconciliation needed to be done and this calculation was part of that process.

The McCulloughs' primary contention for why SMA's interpretation is not reasonable is that it renders the inclusion of the "known" claims language in the release meaningless given that SMA knew there was an issue related to the amount of unremitted commissions. They explain that the issue of the amount of "so-called 'missing monies'" was specifically contemplated in the Separation Agreement and that this issue was the only matter "still in controversy" under the agreement. They maintain that in the absence of an intent to preserve the claims related to the money, SMA's claims would fall within the broad release.

But if the "outstanding issue" excepted from the release is the dispute over the amount of unremitted commissions, it does not matter if the nature of or the underlying legal theories related to the unremitted commissions were known or unknown at the time of the release; any claims connected to the unremitted commissions were not released. Nothing in the language of the release or the exception to the release prohibits an extra-contractual claim related to the missing money as opposed to a contractual claim related to the missing money. *See, e.g.*, *id.* at 938 (general categorical releases are to be narrowly construed). Nor does the Separation

–20–

Agreement contain a recital that the parties resolved the issue of whether McCullough owed SMA money. Rather, paragraph 3 recognizes there is an outstanding issue related to the money, and the amount of commissions owed (offset by any amount owed to McCullough) was supposed to have been accounted for through the procedures outlined in that paragraph. The McCulloughs do not respond to SMA's contention that the McCulloughs' interpretation renders the term "outstanding issues" meaningless. That is, if you limit the "outstanding issue" to the accounting under paragraph 3 to determine how much money was owed, then the term "outstanding issues" in the exception to the release would be irrelevant because the accounting would simply be an "obligation" provided for in the agreement.

The record shows SMA knew there were some unremitted commissions and had been trying to get information from McCullough to reconcile their income for over two years before the parties entered into the Separation Agreement. McCullough did not cooperate, resigned from his employment, and announced he was selling the financial services book of business to a competitor. The parties entered into an agreement and promised cooperation in figuring out "who owes who money." McCullough did not believe he owed money to SMA. In light of the facts and circumstances leading up to the execution of the Separation Agreement, we conclude SMA's interpretation of the exception to the release as permitting suit on claims connected to the amount of unremitted commissions, including McCullough's conduct leading up to the issue of unremitted commissions, that were not resolved by the Separation Agreement is reasonable, and therefore, the McCulloughs cannot conclusively establish that the release barred the extra-contractual and equitable claims as a matter of law.[4] Accordingly, the trial court properly denied

---

[4] We express no opinion on whether the McCulloughs also offered a reasonable interpretation of the mutual release or exception to the release.

the motion for instructed verdict and amended motion for judgment notwithstanding the verdict on this ground.

**6. The McCulloughs' additional arguments related to the Separation Agreement**

The McCulloughs raise two additional arguments as part of their first issue, both of which are unavailing. The first argument is that SMA's equitable claims for unjust enrichment and money had and received are not viable because the same subject matter is covered by the express terms of the Separation Agreement. We note that unjust enrichment is not an independent claim; rather it is a theory of recovery that "characterizes the result of a failure to make restitution of benefits either wrongfully or passively received under circumstances which give rise to an implied or quasi-contractual obligation to repay." *Walker v. Cotter Props., Inc.*, 181 S.W.3d 895, 900 (Tex. App.—Dallas 2006, no pet.). Money had and received is an equitable claim that conceptually belongs to the doctrine of unjust enrichment. *Edwards v. Mid-Continent Office Distribs., L.P.*, 252 S.W.3d 833, 837 (Tex. App.—Dallas 2008, pet. denied) (quoting *Amoco Prod. Co. v. Smith*, 946 S.W.2d 162, 164 (Tex. App.—El Paso 1997, no writ)). The claim "seeks to restore money where equity and good conscience require restitution." *Id.* Importantly, under the principle of unjust enrichment, restitution is an appropriate remedy in circumstances where the agreement contemplated is not fully performed. *City of Harker Heights, Tex. v. Sun Meadows Land, Ltd.*, 830 S.W.2d 313, 319 (Tex. App.—Austin 1992, no writ). As will be discussed in section II.B.6 of this opinion, there is more than a scintilla of evidence to support the jury's finding that McCullough did not perform under the Separation Agreement. *See Barton v. Sclafani Invs., Inc.*, 320 S.W.3d 453, 463 (Tex. App.—Dallas 2010, pet. denied) (reviewing rulings on motion for directed verdict or JNOV under legal sufficiency test, which fails if more than scintilla of evidence supports the finding). Consequently, we reject

the McCulloughs' contention that the existence of the Separation Agreement bars SMA's ability to recover restitution.

Their second argument is that SMA's fraud claim is barred by the disclaimer of reliance clause contained in the Separation Agreement, which states:

> The parties agree that this letter agreement embodies the entire agreement of the parties with regard to the subject matter described herein and supersedes any prior agreement and any oral representations. *The parties have made their own investigations and are not relying on any statement or representation not contained herein.* Since the parties are represented by counsel and both counsel have had input in the drafting of this letter agreement, this letter agreement will not construed against either party.

(Emphasis added). The McCulloughs contend this provision "expresses the Parties' clear intent to waive or release fraud claims by conclusively establishing disclaimer, or waiver, of reliance by SMA," which is an essential element of SMA's fraud claim. We disagree. We read this disclaimer-of-reliance clause as relating to the parties' decision to enter into the Separation Agreement. Thus, the clause disclaiming reliance would preclude a fraudulent inducement claim related to the agreement, but not the fraud alleged by SMA, which was based on McCullough's failure to disclose that he had received and failed to remit SMA's income and that he was doing business on the side.

## 7. Issue One Disposition

Based on our conclusion that the McCulloughs did not conclusively establish that the release barred SMA's extra-contractual and equitable claims as a matter of law and our rejection of their additional arguments related to the Separation Agreement, we overrule the McCulloughs' first issue.

## B. Challenges to the Legal and Factual Sufficiency of the Evidence

In his second and third issues, McCullough raises legal and factual sufficiency challenges to nearly all of the jury's liability findings. He argues in his second issue that even if the release

did not bar SMA's fraud, breach of fiduciary duty and related equitable disgorgement, and civil theft claims, there is legally and factually insufficient evidence to support the jury's answers on those claims. He asserts in his third issue that the jury's answers related to his breach of the Separation Agreement are not supported by legally or factually sufficient evidence. We analyze these issues under the same legal standards.

When an appellant challenges the legal sufficiency of the evidence on a matter for which he did not have the burden of proof, he must demonstrate on appeal that there is no evidence to support the adverse findings. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983). Under a no-evidence point, we consider the evidence in the light most favorable to the verdict, indulging every reasonable inference in support. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We are mindful in our review that jurors are the sole judges of the credibility of the witnesses and the weight to be given their testimony. *Id.* at 819. A legal sufficiency challenge fails if there is more than a scintilla of evidence to support the judgment. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002). "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller*, 168 S.W.3d at 827. Evidence that does no more than create a surmise or suspicion is insufficient to rise to the level of a scintilla and, in legal effect, is no evidence. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004).

When we evaluate a factual sufficiency challenge, we must consider and weigh all the evidence; we can set aside a verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986). If we affirm a challenged jury verdict as being supported by factually sufficient evidence, we need not detail all the evidence in support of the verdict. *In re*

*Columbia Med. Ctr. of Las Colinas, Subsidiary, L.P.*, 290 S.W.3d 204, 211 (Tex. 2009) (orig. proceeding) (citing *Ellis Cnty. State Bank v. Keever*, 888 S.W.2d 790, 794 (Tex. 1994)). We must not substitute our judgment for that of the jury and should remain cognizant that the jury is the sole judge of witness credibility. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

**1. Relevant testimony and evidence**

Because our review of these issues requires us to consider the entire record, we recount the testimony and evidence relevant to our consideration of the issues below.

**a. Testimony of Don Medlin**

Medlin testified SMA hired McCullough for his expertise in financial services insurance products and trusted McCullough to handle the income for the financial services division and run the division's day-to-day operations. Through his employment at SMA, McCullough received confidential business information about SMA's accounts that was not available to every SMA employee. The information included any financial information related to the accounts. Medlin testified that SMA owns the accounts that are produced by the employees within the company. McCullough did not have an ownership interest in SMA, the firm's accounts, or in the financial services division book of business. And until the parties entered into the Separation Agreement, McCullough did not have the authority to sell the book of business. Medlin explained that when the division made a profit, McCullough received a bonus of one-third of the profit earned, but McCullough did not share in the division's losses or pay any expenses associated with running the division.

When Medlin found out that SMA had been receiving financial services commissions from McCullough rather than from direct payment by the carrier, he thought the issue could be addressed on a "low-key basis" and did not anticipate any problems in resolving the issue.

–25–

Medlin knew of times when McCullough would endorse a check and bring the check to SMA, and Medlin discovered that McCullough changed the carrier contracts so that commissions "were all made payable to him." Medlin said the property and casualty side of the firm did not receive commission income in this manner and this was "not the way that [SMA] wanted it done" for financial services. Nor could Medlin think of a valid business reason for this practice. Medlin testified that although he was troubled by the accuracy of SMA's financial information, the issue was not an "overwhelming concern" at that time. To Medlin, "it was a business responsibility that [SMA] had to take care of," and he "didn't foresee any long-lasting problems." Medlin tasked the accounting department with addressing the issue.

Periodically, Medlin would receive reports from the accountants that McCullough was not providing the information necessary for SMA to update and reconcile the accounts. McCullough was questioned about why certain carriers were requiring SMA to receive commissions through McCullough and informed of SMA's concerns about not having access to their money from a cash-flow standpoint. Medlin said there was "always an excuse" from McCullough, and the accounting department continued to follow up with McCullough to resolve the issue. Medlin wanted McCullough to provide the information so the accounting department could relieve McCullough of any accounting responsibilities. Medlin admitted that at the time the firm started the financial services division, SMA did not have an accounting software program capable of detailing the division's accounting information. SMA purchased one several years later to facilitate the accounting.

The Medlins relied on the commission reports and corresponding commission checks provided by McCullough for purposes of determining what money was earned by the division. Medlin considered the reports to be a proper accounting of what McCullough had been receiving. Medlin also testified that if McCullough failed to disclose that he received checks or

electronic fund transfers for which he had not accounted, Medlin relied upon that silence by not taking action.

Medlin testified that in the first part of 2008, they were "pushing to get this issue resolved." Part of the reason for the push was that the income for the first quarter of 2008 was "way off," and the Medlins decided "it was time to sit down and cover all the outstanding issues and get everything up to speed." One of the issues discussed with McCullough was that SMA wanted control of all bank accounts in which SMA's income was deposited. After they met with McCullough, though, Medlin said they came away from the meeting believing McCullough had "just been overworked" and the issue related to the division's loss of income was not as serious as they had thought. Medlin testified McCullough was "rather convincing," and Medlin thought they would not have to deal with this any further.

The Medlins continued the push to resolve the accounting issues in June and July 2008. Medlin testified they were looking to identify and get access to "everything" to reconcile SMA's financial records. Medlin was concerned because the firm's outside CPA advised him SMA could not withstand an IRS audit without McCullough's records. Medlin also was concerned about SMA being able to meet the conditions of their fidelity bond, which required SMA to maintain records in accordance with the provisions of the bond.

Medlin testified to a series of e-mails between SMA and McCullough showing the efforts to get information from McCullough. The e-mails were admitted as exhibits. In a June 2008 e-mail, Robin Boemer, one of SMA's accountants, asked McCullough about providing his monthly bank statements so SMA could satisfy the requirements of the fidelity bond. McCullough responded over a month later and informed Boemer that he would look into the option of receiving a paper statement for the accounts. McCullough also wrote that he had started to set up a separate bank account "so there will be less confusion." Boemer forwarded her e-mail

conversations with McCullough to the Medlins, expressing concern that more than a month had elapsed and McCullough had not provided the bank statements despite the ease in doing so with online banking. Medlin responded that if McCullough was "setting up a brand new account it should be one that we control as per [McCullough's] discussion with Rod." According to Medlin, McCullough knew SMA wanted to have control of the bank accounts in which SMA's commissions were deposited.

Medlin also testified about e-mails sent in September 2008 related to concerns raised by Robert Wilson. McCullough was informed by Boemer that a particular concern was "the possibility of missing statements" from one of SMA's largest carriers that had standardized statements and electronic fund transfer dates. McCullough was asked to provide the missing commission statements. Instead of providing the statements, McCullough responded by complaining about SMA's lack of an accounting system back when he started. He also said the problem with the request for bank statements is that he does not receive monthly statements; he prints off his activity for "a week or two" and writes the applicable checks. McCullough further complained about dealing with the accounting departments from the carriers to get prior vendor statements. Medlin considered McCullough's response to be "another put off," and because they were not getting any results from McCullough, the Medlins asked McCullough to meet with Wilson. Medlin testified that McCullough agreed to do so and provide the requested information.

In January 2009, McCullough told Medlin he was leaving SMA. McCullough denied taking another job; he told Medlin that he was "deciding what he was going to do." Medlin said that at the time, McCullough did not officially resign, so to prepare for a transition, Medlin asked McCullough for a meeting. Medlin testified that at the meeting, which was attended by the Medlins, McCullough, and their respective attorneys, Medlin learned that McCullough had "been

out with the information about [SMA's] business and, in fact, had made an arrangement to sell the financial services business" to a competitor and was taking "several of the employees" with him. Medlin said he was "blindsided" by the announcement and considered suing McCullough. The Medlins decided, however, that it would be better to work out a "business arrangement" with McCullough—the Separation Agreement—to protect SMA's clients.

Medlin testified that when McCullough announced his resignation, McCullough still had not provided the bank statements and other financial information requested for the reconciliation of commissions. But Medlin "had an idea that there was some missing money." The accounting department did an internal accounting and estimated that there was a little over $137,000 in anticipated commissions to be received. In contrast, McCullough's attorney communicated that McCullough's calculations reflected "a little more than $23,000 in unreconciled commissions." The calculation was handwritten on a piece of paper with the words "Missing $" at the top of the page. McCullough's attorney represented that this was his "client's calculation." Medlin understood the calculation to be an identification of what McCullough knew he owed SMA, but according to Medlin, when McCullough signed the Separation Agreement, he never admitted that he owed SMA money.

Medlin testified the purpose of the Separation Agreement was to resolve the issues with McCullough. One of the issues was the "[i]ncome that was earned and not paid to [SMA]" before the termination date, which was addressed by paragraph 3 of the agreement. That paragraph also provided that the CPA would account for any money owed to McCullough. But McCullough did not provide any documentation of expenses he claims were not paid. Medlin explained that to receive expense reimbursement, SMA required the employee to submit an expense report, and SMA paid the specific amount. Medlin made the decision to not pay

–29–

McCullough's salary for the last two weeks in February 2009 because McCullough was not doing any work for SMA.

Medlin looked to Wilson to tell him whether SMA received what was needed for the CPA Determination and authorized Wilson to send the non-compliance notice in March 2009 because there was a deficiency in getting the Due Diligence Items. Medlin testified that McCullough did not fully comply with the Due Diligence Items despite receiving the non-compliance notice; Medlin said McCullough provided only a "hodgepodge" of stuff. Wilson eventually got the requested bank statements, but this was not until after SMA filed suit and sought the records by subpoena to the McCulloughs' bank. Medlin said one of SMA's objectives in filing suit was to get the records they needed to do the accounting.

Medlin testified that during the course of the litigation, SMA discovered that in 2008, McCullough received $35,034 from one of SMA's clients, Andres Construction, for some consulting work he had done related to the client's group medical plan. McCullough did not disclose to SMA that he was doing any consulting work for Andres Construction or that he received a fee for the work he performed.

### b. Testimony of Robert Wilson

Wilson testified he agreed to meet with McCullough in October 2008 about accounting for the financial services division after the Medlins explained they were having a difficult time getting information from McCullough. At the meeting, Wilson told McCullough that SMA "want[ed] to get [him] out of the accounting business" and SMA "just need[ed] the records from [him] in order to sync everything up and make sure that all the income is being reported." Wilson gave McCullough a deadline and said McCullough agreed to work on gathering the information. McCullough said nothing about not being able to provide the information or do the

–30–

other things asked of him at the meeting, such as close his joint account with his wife or change the payment instructions with the carriers, within the deadline.

Wilson testified that after the meeting "[n]othing" happened in terms of addressing the requests. Wilson said he sent prompts to McCullough to check on McCullough's progress and that McCullough provided some "printouts" from a bank website that did not represent a "complete record of all the transactions for a statement cycle." Wilson could tell the printouts were incomplete because of the page numbering and the fact that portions of the statements were redacted. Wilson explained he needed bank statements that showed the full month's activity. If Wilson did not have a full month's activity, "it would be easy to not see everything that happened that month." Wilson said McCullough did not provide the specific items Wilson requested.

Wilson understood that under the Separation Agreement, he was to determine the amount of commissions McCullough owed to SMA and reduce that amount by any amounts due McCullough. Wilson said the list of Due Diligence Items was based primarily on what was discussed with McCullough during the October 2008 meeting, and the items were what Wilson needed to the accounting work required for the CPA Determination. Wilson testified that before he sent the March 2009 non-compliance notice, "pretty much all [McCullough] had provided" was the printouts from the bank website. Wilson eventually received the information he needed after the McCulloughs' bank provided the bank statements, deposit slips, and canceled checks pursuant to the subpoena.

Wilson testified to the report he prepared showing the money McCullough received but did not remit to SMA. Wilson included over fifty pages of accounting detail with his report. In his review of the documents provided by the bank, he identified six accounts in which McCullough deposited commission money. One account was McCullough's joint account with

–31–

his wife; two accounts related to accounts McCullough set up to receive SMA commissions, including commissions associated with the sale of securities; another account was a personal savings account; and the remaining two accounts were the individual savings accounts for the McCulloughs' children. Wilson said that by reviewing all the documents listed in his report, he was able to identify the deposits that went into McCullough's accounts that did not get paid to SMA. Wilson identified $138,747.39 in unremitted commissions. He testified his report does not include any discussion related to reducing this amount by money owed to McCullough because that was outside the scope of his assignment. That is, Wilson's report is not the CPA Determination as contemplated by the agreement. Rather, he performed an accounting as an expert in the lawsuit to determine what McCullough owed SMA.

Wilson's report includes detail related to the $35,034 consulting fee McCullough received from Andres Construction. Wilson determined that the fee was deposited in the McCulloughs' joint account on December 15, 2008. The report read that although McCullough "took the position on his 2008 Individual Federal Income Tax Return that this payment was not related to his employment by SMA," Wilson determined that because Andres Construction was an SMA client, the amount should have been remitted to SMA. Wilson based this conclusion on the provision of the Separation Agreement that said "any commissions and other revenues associated with all insurance products sold by McCullough or the financial services division" were to be included in the determination of the amounts received by McCullough through the termination date and not remitted to SMA.

Wilson's fees for performing the accounting totaled $61,541.17. He testified that had he done the CPA Determination for which SMA agreed to pay in the Separation Agreement, it would have cost SMA between $25,000 and $30,000. He explained that the accounting he did

for purposes of the lawsuit cost more because there was a lot of wasted time and effort in trying to analyze incomplete information and figure out what was missing in those two years.

### c. Testimony of Robert McCullough

McCullough testified by video deposition and before the jury. In his video deposition, McCullough testified he was not sure whether he wrote that there was $23,000 in "Missing $."[5] He also did not know what the $23,000 was tied to; he thought there were three or four missing statements, and the notes represented what he found. McCullough was then asked about certain electronic deposits made by insurance carriers into his bank accounts and whether he remitted the amounts to SMA. He agreed the amounts represented commissions received by him for business done through the financial services division of SMA. But he was not aware of the amounts being remitted to SMA. He also had "no clue" why he transferred money on multiple occasions from the business account into his personal accounts. He agreed that the purpose of the business account was to receive commissions from the carriers and then he was to remit the commissions to SMA so SMA could pay the division's expenses. He also agreed there would be no reason for him to transfer money out of the business account.

During his live testimony, McCullough agreed that as the president of the financial services division at SMA, he occupied a position of trust and confidence. Despite his title, he was not an officer of the firm; he understood he was SMA's employee. McCullough's position included responsibilities for the commissions generated by the division.

McCullough had no memory of why he created the calculation of "Missing $." He speculated that the calculation was part of his "due diligence" leading up to the Separation Agreement but said this was just "some very, very preliminary research" on commission

---

[5] A document examiner and handwriting expert testified, however, that everything on the calculation of "Missing $" except for the final total was written by McCullough.

statements he thought were missing. He testified, however, that based on the testimony presented at trial, he "believe[d] those do all match up" to commission checks that he received and did not remit to SMA. Even though he had determined that these commissions were missing, he did not pay SMA the money because he was leaving.

McCullough admitted that in previous hearings before the court, he testified that in his opinion, he did not have possession of any commission checks that should be given to SMA. He also had verified in his answers to SMA's interrogatory requests that he knew of no commissions received between 2006 and February 27, 2009 that were not remitted to SMA. But he also said there was over $13,000 sitting in his business/securities account that he was prepared to give SMA if SMA would sign the appropriate paperwork. McCullough testified that this amount covered commissions received for the last months in 2008 and the beginning of 2009. He said he did not ask SMA to sign the paperwork so SMA could receive the money because "that's what we mutually agreed on." He asserted that he finally realized he owed SMA some money after reviewing Wilson's report.

McCullough also agreed that his attorney stipulated that certain items on Wilson's report represented commissions McCullough received but did not account for or deliver to SMA.[6] He testified that he never performed his own accounting to determine the amount of unreconciled commissions independent of any work done by Wilson or his own accounting expert; he said this was "not his job." He also did not reconcile his own checkbook. He agreed that it "appears to be the case" that there were instances of him receiving a check and not endorsing it to SMA. He knew this was SMA's money and testified that "[i]t was money [he] should have remitted" to SMA. He also testified he knew that when he received checks and electronic fund transfers from the carriers, it was for the benefit of SMA and that he was supposed to give SMA any checks or

---

[6] His attorney told the jury that McCullough will "agree there's $96,000 that he missed . . . ."

–34–

money received by electronic fund transfer because SMA paid the overhead and expenses associated with the division. He further understood that SMA was supposed to receive the money earned on the book of business. He proclaimed, however, that he thought the money was his because the "whole business was in [his] name."

McCullough described the six bank accounts identified in Wilson's report. He testified that one business account was set up as an expense account to receive and reimburse his expenses but that "last year or so, we set that up to have EFT's run through that account." The other business account was to receive commissions associated with the sale of securities. When asked how commission money was put in savings accounts for his children when McCullough had two designated business accounts, McCullough testified that he "just must have made a mistake, human error." He agreed that it happened more than one time and said that he never read the statements related to the accounts. He explained that he signed "hundreds and hundreds of checks" with "zero checks and balances" at SMA and the checks could have been deposited into the personal accounts "accidentally." He also complained that SMA was a "loosely run ship" with no accounting system or audit. But he admitted that SMA did not know he deposited commissions into his personal accounts. McCullough did not know whether it was wrong to put the money in there in the first place.

McCullough claimed SMA did not ask him to re-wire electronic fund transfers he received so the money could be transferred to SMA's bank account until 2008 when he was planning to leave the firm despite e-mail requests as early as 2006 asking McCullough to arrange for money to be re-wired. He said he "guess[ed]" he did not understand what SMA wanted by the 2006 requests.

McCullough started shopping the book of business to four or five commercial insurance agencies in the summer of 2008. He ultimately decided to sell the book to Frost, but did not tell

the Medlins about this until January 2009. He claimed he did not disclose the sale because it was a "complicated situation" and at the time, he did not feel it was in his best interest. He also did not tell the Medlins that he got information to facilitate the sale from SMA's financial records. McCullough thought that because he did not have a non-compete agreement with SMA, he could take the clients with him because he was listed as the named broker. Despite this belief, he entered into the Separation Agreement to avoid being sued.

Regarding the consulting fee received by Andres Construction, McCullough testified that he was entitled to keep the $35,034 earned because, in part, he did the work as a favor for a friend. The other part was that he believed this was his personal opportunity because he built the financial services division off his "proprietary knowledge and information." McCullough explained that he brought Andres Construction to SMA as a client in 1998 but until 2007, he did not do any work for Andres Construction outside of his capacity as an SMA representative. He said that in 2008 he consulted on the company's group medical plan, which was serviced by another agent. For this work, McCullough reviewed marketplace rates and prepared a proposal on SMA's template, which McCullough said he created. McCullough testified SMA did not know he was doing this work for Andres Construction, and this was "one of the many, many, many things [SMA] had no idea what we were doing."

Before the Separation Agreement was signed, McCullough said that he had been sending SMA's attorneys his bank statements. He testified that because it was such a contentious separation, he made a "good faith intent right up front" to provide his statements and tax returns. He said Frost also helped provide the Due Diligence Items. When he received the non-compliance notice sent by Wilson in March 2009, he felt the notice was a "nonfactor" because he "had already complied" with the requests. He claimed the "only thing" he did not provide was "copies of [his] kids' statements" because "that was a huge invasion of [his] privacy." He

–36–

admitted, however, that had SMA not subpoenaed the records from the bank, Wilson would not have known that over $31,000 of SMA's money went into those accounts. McCullough said that other than the statements for those accounts, he tried his best to turn over all the Due Diligence Items.

McCullough testified that the "outstanding issue" that existed at the time the Separation Agreement was signed was that "[t]hey owe me some money. I owe them some money. Who owes who what? It's both sides of the equation." He also testified that based on SMA's internal accounting done before the agreement was signed, "everybody knew that we were going to find some money that was not turned over." He said he made it clear that if he owed SMA some money, he would pay it. He wanted SMA to tell him the amount and then also the amount SMA owed him. McCullough admitted he never submitted an expense report showing any expenses owed to him.

McCullough testified that even though he admitted in his deposition that he had SMA's money in his accounts, he has not paid that money back to SMA. He said he had "no problem paying that money," but this matter was to be addressed by the Separation Agreement. He added that SMA owes money too, and until SMA's CPA does that due diligence, "no one is writing anybody a check."

### d. Other Testimony

The jury also heard testimony from representatives of Andres Construction. The chief financial officer for the company testified that Warren Andres had asked McCullough for help in reducing the company's insurance costs. Because McCullough's help resulted in huge savings, Warren offered to share the savings with McCullough. The offer was to pay McCullough twenty-five percent of the savings or $35,034.

Tom Stewart, the McCulloughs' accounting expert, testified to his conclusion that SMA owes McCullough $38,600. He said he relied on the number provided in Wilson's report as the starting point for his work, but after he subtracted the Andres Construction fee and focused on the profitability of the financial services division, he concluded that money was owed to McCullough. Wilson provided additional testimony and a supplemental report rebutting Stewart's conclusions. In the supplemental report, Wilson acknowledged that his initial determination that McCullough owes SMA $138,747.39 should be reduced by $1,346.26, which represented an underpayment of year-end profits for two years, for a net amount owed by McCullough of $137,401.13.

## 2. Sufficiency of the evidence that McCullough committed fraud

In his first argument under his second issue, McCullough challenges the legal and factual sufficiency of the evidence to support the jury's finding that he committed fraud against SMA. SMA asserted a fraud claim against McCullough based on his failure to disclose that he had received and failed to remit income to SMA, was doing business on the side while he was an SMA employee, had made efforts to sell SMA's book of business, and used SMA's confidential business information to further the sale. *Cf. Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 181 (Tex. 1997) (fraud by non-disclosure arises when one with duty to disclose facts fails to do so).

McCullough points to the "clear and express terms and provisions" of the Separation Agreement to support his contention that the jury's answer that he committed fraud by non-disclosure against SMA is not supported by legally or factually sufficient evidence. He claims the agreement's terms "belie the conclusion" that he failed to disclose the matters upon which SMA's fraud claim is based and that the agreement provides SMA relief for each item SMA alleged was not disclosed. He maintains that by providing such relief in the agreement, "it

follows McCullough did not intend SMA act without knowledge of any undisclosed facts and that SMA could not have suffered injury *as a result* of acting without knowledge of any undisclosed fact."

SMA responds that McCullough misconstrues the nature of their fraud claim. SMA argues that the fact that the agreement reflects SMA's knowledge that McCullough owed money for unremitted commissions for some wrongdoing does not change the fact that from "at least 2006 to 2008, McCullough misappropriated SMA's money and did not disclose that fact to SMA so that SMA could prevent the continuing loss of its money." SMA maintains that because the complained-of fraud occurred before the Separation Agreement, the terms of the agreement are irrelevant to knowledge and causation of those events.

We agree with SMA's contentions and conclude the jury's finding that McCullough committed fraud by non-disclosure against SMA is supported by legally and factually sufficient evidence. As evidenced by SMA's pleadings and the jury question, SMA's fraud claim is based on McCullough's failure to disclose his misuse of SMA's money, which included not only the amount of unremitted commissions but also the fee received from performing consulting for Andres Construction. In the fraud damages question, the jury was asked to quantify the amount of money McCullough "retained which he was not entitled to retain" and the extra accounting fees incurred by SMA to determine this amount. The jury found damages in the amount of $137,401.13 (the amount of unremitted commissions from Wilson's supplemental report) and $36,541.17, which represented the amount SMA spent trying to figure out the amount of unremitted commissions.

The record shows that McCullough, as the president of the financial services division, directed commission payments to him by changing the payment instructions with various insurance carriers. Some of the commissions were paid to him by check sent to his home address

and other commissions were deposited directly by the carrier into bank accounts to which SMA did not have access. McCullough transferred money between his accounts, with money transferred from his business account into his various personal accounts. McCullough admitted there was no reason for moving money out of the business account. SMA knew there was something off with the income for the division, but when SMA asked McCullough to help reconcile the accounting for commissions, McCullough did not provide the requested information, leaving SMA without access to its cash and in the position of relying on the commission reports submitted by McCullough. McCullough did not respond to SMA's questions about why carriers wanted commissions to be paid in this manner. And the record does not contain an explanation for this practice.

The record includes McCullough's admissions regarding his misuse of SMA's money and other non-disclosures related to the financial services book of business and use of SMA's confidential client information. McCullough specifically acknowledged that there were instances in which he received commission checks or electronic fund transfers from carriers but did not forward the commission money to SMA. He agreed he received the commissions for the benefit of SMA, that he was supposed to give the money to SMA, and that this was money he should have turned over to SMA. He further agreed that he had told the court in previous hearings that he did not have possession of any commission checks that should be returned to SMA. Yet his attorney told the jury there was $96,000 in missing money. McCullough also admitted that SMA did not know that he deposited commissions that belonged to SMA into his personal bank accounts, including his children's savings accounts, received $35,034 for consulting for Andres Construction (a fact SMA learned during the course of the litigation), shopped the financial services book of business to competitors, or used SMA's financial information to facilitate a sale. McCullough told the jury that it would not have been in his best

–40–

interest to disclose the fact of the sale of a division he had no authority to sell. McCullough's only explanation for why SMA's money was in his personal accounts was that he must have made a mistake; he had "no clue" why he transferred money from his business accounts to his personal accounts. Despite his responsibility for accounting for the division's income, he never read his bank statements for the children's savings accounts or balanced his own checkbook.

Medlin testified that McCullough never disclosed that he received and kept SMA's money. And based on this non-disclosure, SMA relied on his silence and did not take any action to remedy the situation. Instead, SMA spent over two years asking McCullough for access to information and bank accounts so SMA could reconcile their financial information and retrieve their money from his accounts. McCullough would not provide his bank statements showing the monthly activity or provide access codes to the accounts, even after he signed the Separation Agreement, which required his cooperation in providing the Due Diligence Items. He also ignored requests for him to have money re-wired from his accounts to SMA. The jury heard how McCullough offered excuses and complaints about SMA's accounting systems. Medlin told the jury that one of the reasons they filed this lawsuit was to gain access to the bank records for the reconciliation.

In the years leading up to suit, Medlin knew only that there was an issue with unremitted commissions that affected the financial services income and that SMA needed to an accounting; he thought this was a business responsibility they needed to address and did not think it would be a long-lasting problem. When they received the records from the bank, SMA discovered the extent of the situation, including the fact that McCullough put a significant amount of SMA's money into his children's savings accounts, a fact which would not have been discovered had SMA not subpoenaed the records from the bank.

After reviewing the record in the light most favorable to the verdict, we conclude that reasonable and fair-minded people could reach the conclusion that McCullough committed fraud by non-disclosure against SMA. *City of Keller*, 168 S.W.3d at 827. Likewise, after considering and weighing all the evidence, we conclude the evidence was not so weak as to render the jury's finding of fraud unfair or unjust. *See Dow Chem. Co.*, 46 S.W.3d at 242. Thus, McCullough's legal and factual sufficiency challenges to the jury's fraud finding fail.

### 3. Sufficiency of the evidence that McCullough breached his fiduciary duty

McCullough's next argument under his second issue attacks the jury's finding that he breached his fiduciary duty to SMA. SMA alleged a claim for breach of fiduciary duty against McCullough based on his (1) receipt and failure to properly account for SMA's income; (2) failure to remit to SMA all of their income; (3) efforts to sell a book of business owned by SMA while employed by SMA without SMA's knowledge or consent; (4) disclosure of SMA's confidential information in furtherance of his efforts to sell SMA's book of business; and (5) appropriation of insurance-related business for himself and failure to disclose this fact to SMA, including but not limited to, the Andres Construction transaction that generated a fee of over $35,000. *See, e.g.*, *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 510 (Tex. App.—Houston [1st Dist.] 2003, no pet.) ("When a fiduciary relationship of agency exists between employee and employer, the employee has a duty to act primarily for the benefit of the employer in matters connected with his agency.") (citing *Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 200 (Tex. 2002)).

Like his arguments challenging the jury's fraud finding, McCullough invokes the existence of the Separation Agreement and points to evidence surrounding the execution of the agreement to support his contention that there is no evidence that McCullough breached any fiduciary duty owed to SMA or that his actions caused SMA damage. He claims that the facts in

this case establish that he "satisfied his duty to account for profits owed SMA by entering into the Separation Agreement, [and] that he acted fairly in disclosing and dealing with SMA regarding such profits and the sale of his book of business to Frost." We disagree.

McCullough appears to argue that because he disclosed the fact that there were "unremitted revenues [he] had not yet accounted for to SMA" at the time of his termination, there is no evidence to show he "failed to properly account for income of SMA" or did not deal fairly with SMA. *Cf. Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942) (recognizing that if fiduciary employee "takes any gift, gratuity, or benefit in violation of his duty, or acquires any interest adverse to his principal, without a full disclosure, it is a betrayal of his trust and a breach of confidence, and he must account to his principal for all he has received"). But like their fraud claim, SMA's breach-of-fiduciary duty claim is based on conduct that occurred before the parties entered into the Separation Agreement. While McCullough agreed to cooperate so that an accounting of the missing money could be done, this after-the-fact disclosure of the facts that form the basis of SMA's breach-of-fiduciary duty claim does not restore the parties to a position as if there had been no breach.

McCullough was the president of SMA's financial services division and was responsible for running the division and handling the income generated for the division. McCullough's position as a trusted employee of SMA called on him to properly account for SMA's commission income, including remitting to SMA any commissions he collected for SMA's benefit, and make full disclosure of all the facts and circumstances concerning his receipt of the commissions from SMA's clients, like Andres Construction. The record shows that McCullough retained over $137,000 to which he was not entitled, did not account for the missing money despite requests from his employer for information to help reconcile SMA's financial records, and in fact, stalled his employer's efforts to do a reconciliation. His stalling lasted for two years before he resigned

and agreed to cooperate to accomplish the accounting. During the years leading up to the Separation Agreement, McCullough was able to receive the commission payments from carriers because he changed the payment instructions on contracts, which was not how the Medlins wanted commissions handled, and the record contains no response by McCullough to SMA's questions about why commissions were handled in this way. Nor could he explain why commissions were transferred from his business account into his personal accounts. By McCullough's own admission, SMA did not know he was putting SMA's commissions into his personal accounts. He agreed that the commissions he collected were for the benefit of SMA and should have been remitted to SMA. Medlin relied on the commissions reports provided by McCullough to determine the income for the financial services division and trusted McCullough to provide a proper accounting for commission income.

McCullough maintains that in the Separation Agreement, he "agreed to properly account for income owing SMA, including those derived from any clients not previously disclosed to SMA, *i.e.*, Andres Construction" and given these facts, he "*did account for* all monies he had received." He contends that as a matter of law, he cannot be held to have breached any fiduciary duty to account for profits due SMA. This contention is contradicted by the evidence. Although McCullough says he accounted for all the money he received but did not remit to SMA, the record shows he only *promised* to so. When he signed the Separation Agreement, he agreed to cooperate with the accounting mechanism so the parties could determine who owes who money. SMA claimed he did not provide the Due Diligence Items, sent him notice of this fact, and ended up filing suit to get the documents needed to do the accounting. Wilson eventually determined that McCullough had $137,401.13 of SMA's money and that the amount included a consulting fee McCullough received from one of SMA's customers while he was still employed by SMA. McCullough did not tell SMA he did this consulting work.

–44–

McCullough finally argues that his at-will status and disclosure of the fact that he was selling the financial services book of business to Frost shows that he acted fairly and did not attempt to retain any benefit for himself to the exclusion of SMA regarding the Frost sale. He adds that SMA's agreement to the Frost sale and receipt of half the purchase price "negates a finding of any breach of a fiduciary duty by [him]." Generally, an employee has no duty to disclose to his employer his plans to compete with the employer. *See PAS, Inc. v. Engel*, 350 S.W.3d 602, 613 (Tex. App.—Houston [14th Dist.] 2011, no pet.). But even though an at-will employee may plan to compete with his employer and take steps to further that plan without disclosing his plans to his employer, he may not act for his future interests at the expense of his employer or engage in a course of conduct designed to hurt his employer. *Id.* at 614; *see also Abetter Trucking Co.*, 113 S.W.3d at 510. Here, McCullough testified he began shopping the financial services book of business to SMA's competitors over six months before he told SMA about it and not until he had made a deal with Frost to buy the book of business. Medlin testified that the financial services book of business belonged to SMA and that McCullough did not have the authority to sell it. McCullough said he did not disclose the sale to SMA because it would not have been in his best interest. We disagree that the evidence shows McCullough acted fairly with regard to the sale of the book of business to Frost.

Anything more than a scintilla of evidence is legally sufficient to support the jury's finding that McCullough did not comply with his fiduciary duty to SMA. *See City of Keller*, 168 S.W.3d at 827. And we conclude that more than a scintilla of evidence exists because the evidence discussed above furnishes some reasonable basis for fair-minded people to reach the verdict under review. *Id.* Further, because the evidence supporting the jury's finding that McCullough breached his fiduciary duty is not so weak and the evidence to the contrary is not so overwhelming that the finding should be set aside, we also conclude there was factually

–45–

sufficient evidence to support the jury's finding. *See Dow Chem. Co.*, 46 S.W.3d at 242. Accordingly, McCullough's legal and factual sufficiency challenges to the jury's liability finding on the claim for breach of fiduciary duty also fail.

**4. Sufficiency of the evidence supporting disgorgement award**

McCullough's next argument in his second issue relates to the disgorgement damages awarded to SMA for McCullough's breach of his fiduciary duty. The jury found that McCullough received $402,210 in salary, profits, or other income during the time he committed his breach of fiduciary duty and that he was entitled to receive only $201,105. The final judgment states that SMA has a judgment against McCullough for $201,105.00 "as an equitable forfeiture and disgorgement remedy."

Under the equitable remedy of disgorgement or fee forfeiture, a person who renders service to another in a relationship of trust may be denied compensation for his service if he breaches that trust. *Burrow v. Arce*, 997 S.W.2d 229, 237 (Tex. 1999). The remedy essentially returns to the principal the value of what it paid for because it did not receive the trust or loyalty. *Id.* at 237–38. The amount of disgorgement is within the trial court's discretion; the court may "deny him all compensation or allow him a reduced compensation or allow him full compensation." *Id.* at 237 (quoting RESTATEMENT (SECOND) OF TORTS § 243 (1959)).

McCullough first argues that the award was improper because it creates a double-recovery problem in violation of the one-satisfaction rule. McCullough argues that the only evidence presented of profits or fees that he was entitled to receive was the one-third profit on the amount of unremitted money (or 33% of $137,401.13). He claims this profit he was entitled to is "subsumed" in the jury's answer that SMA is entitled to damages in the full amount of the unremitted money, and to allow disgorgement of these same monies in addition to the jury's award of unremitted money results in a double recovery to SMA.

The disgorgement award here does not result in double-recovery problem. Equitable disgorgement is distinct from an award of actual damages in that the disgorgement award "serves a separate function of protecting fiduciary relationships." *Saden v. Smith*, 415 S.W.3d 450, 469 (Tex. App.—Houston [1st] Dist. 2013, pet. denied) (citing *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 874 (Tex. 2010)); *see also Burrow*, 997 S.W.2d at 238 (purpose of disgorgement remedy is to protect relationships of trust by discouraging agent's disloyalty or other misconduct). And because equitable disgorgement and actual damages are intended to address separate and distinct injuries, the one-satisfaction rule does not preclude the recovery of both. *Saden*, 415 S.W.3d at 469.

The basis for the disgorgement award was predicated on the liability question for breach of fiduciary duty, and it was phrased in terms of the "salary, profits or other income" McCullough received "during the time" he committed the tortious conduct. SMA introduced McCullough's payroll records and a spreadsheet showing the bonuses he received in the relevant years. The jury found that McCullough was entitled to half of the $402,210 in "salary, profits or other income" he received, and the trial court ordered McCullough to pay back the other half. *See Burrow*, 997 S.W.2d at 237.

Of course, where equitable remedies exist, "the remedy of forfeiture must fit the circumstances presented" because "[i]t would be inequitable for an agent who had performed extensive services faithfully to be denied all compensation" if the misconduct was slight or inadvertent. *Id.* at 241. So courts should consider certain factors in deciding whether to order disgorgement. *ERI Consulting Eng'rs*, 318 S.W.3d at 874 (listing factors). McCullough generally argues there is no evidence to support the court's decision to order the disgorgement remedy and that the decision violates, rather than promotes, principles of equity, especially in light of the Separation Agreement, which provides a full accounting to SMA for the unremitted

revenues, half of the sales price paid by Frost, and various other promises made to effectuate the agreement. Although he lists the relevant factors for a court to consider, he does not present argument that the trial court failed to consider these factors when it ordered the disgorgement award or analyze how the principles are not supported by sufficient evidence as he is required to do under the relevant standard of review. *See* TEX. R. APP. P. 38.1(i); *see also PopCap Games, Inc. v. MumboJumbo, LLC*, 350 S.W.3d 699, 722 (Tex. App.—Dallas 2011, pet. denied). He also does not explain his contention for how the court's decision to award equitable disgorgement violates the principles of equity. We therefore reject McCullough's argument that "there is no evidence to support disgorgement of fees, profits, or both" under the factors as conclusory and inadequately briefed. *See PopCap Games, Inc.*, 350 S.W.3d at 722. McCullough also has not complained about the amount of the equitable disgorgement award, so we express no opinion on the measure of the equitable remedy or whether the trial court abused its discretion in awarding that amount. *See Saden*, 415 S.W.3d at 469.

## 5. Sufficiency of the evidence supporting a violation of the Texas Theft Liability Act

McCullough's final argument under his second issue is that there is no evidence or insufficient evidence to support SMA's claim that he violated the Texas Theft Liability Act. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 134.001–.005 (West 2011 & Supp. 2013). Under the Theft Liability Act, a person who commits theft as defined by the Texas Penal Code "is liable for the damages resulting from the theft." *Id.* § 134.003(a); *see also* TEX. PENAL CODE ANN. § 31.03(a), (b) (West Supp. 2013) (theft).

In Question No. 7, the jury found that McCullough committed theft against SMA after considering the following instruction:

> "Theft" means unlawfully appropriating property with intent to deprive the owner of the property.
>
> Appropriation of property is unlawful if:

–48–

> (1) it is without the owner's effective consent; or
>
> (2) the property is stolen and the actor appropriates the property knowing it was stolen by another.

McCullough contends that based on the express terms of the Separation Agreement, "there is no evidence, or insufficient evidence, of any 'intent to deprive' SMA of the revenues due and owing them." He also argues that the word "deprive" means "to withhold property from the owner permanently or for so extended a period of time that a major portion of the value or enjoyment of the property is lost to the owner." (quoting TEX. PENAL CODE ANN. § 31.01(2)(A)). And he complains there is no evidence showing he intended to deprive SMA of revenue due them for such an extended period of time or permanently.

We reject McCullough's argument that the terms of the Separation Agreement negate the intent-to-deprive element. The relevant "intent to deprive" is the person's intent at the time of the taking. *See Wirth v. State*, 361 S.W.3d 694, 697 (Tex. Crim. App. 2012) (citing *Wilson v. State*, 663 S.W.2d 834, 836–37 (Tex. Crim. App. 1984)). As with their other claims, SMA's claim that McCullough violated the Theft Liability Act is based on conduct that occurred before the Separation Agreement was signed. The fact that the parties later entered into an agreement addressing the misappropriated property does not nullify McCullough's intent at the time he took and kept SMA's money.

We also reject McCullough's argument that there is no evidence to show McCullough intended to deprive SMA of their money for an extended period of time or permanently. In his report, Wilson identified multiple transactions representing sums belonging to SMA that were deposited into McCullough's various accounts, including his joint account with Julia, that he did not account for or remit to SMA. These transactions began in 2006 and continued through the end of 2008. The record includes testimony and documents showing that SMA sought bank and

commission statements from McCullough as well as access to bank accounts for over two years in an effort to reconcile their accounting information. McCullough dodged the requests and never provided the requested information. He continued the practice of receiving money into his personal accounts despite SMA's requests that he change the payment instructions with the carriers and after he signed the Separation Agreement. McCullough testified that he knew the commissions he received from carriers belonged to SMA and should have turned the money over to them. And despite acknowledging that he realized he owed SMA some money after he reviewed Wilson's report, he has not returned any of the money that he admitted he owed. The intent to deprive can be inferred from the words and acts of the person. *Banks v. State*, 471 S.W.2d 811, 812 (Tex. Crim. App. 1971). When we consider the evidence in the light most favorable to the jury's finding, we conclude there was more than a scintilla of evidence for the jury to infer from McCullough's conduct that he took SMA's money with the intent to keep it permanently or for an extended period of time. *City of Keller*, 168 S.W.3d at 827. Thus, McCullough's legal sufficiency challenge to the jury's theft liability finding fails.

We also conclude that after considering and weighing all the evidence, the jury's finding that McCullough intended to deprive SMA of its money is supported by factually sufficient evidence. McCullough told the jury that SMA had no accounting checks and balances, and because he signed hundreds of checks, the fact that SMA's money ended up in his personal accounts was by accident. He also told the jury it was not his job to perform an accounting of commissions to determine whether he turned all commissions over to SMA (even though he was responsible for commissions as the division's president) and that he did not reconcile his own checkbook. He further said that he thought the money was his because he brokered the business under his name. But as previously stated, McCullough acknowledged that he received commissions from carriers that he should have turned over to SMA. And the record contains no

explanation for why he changed the payment instructions with the carriers so that he could receive SMA's money in the first place. Thus, on this record, the evidence is not so weak as to render the jury's answer that McCullough committed theft unfair or unjust. *See Dow Chem. Co.*, 46 S.W.3d at 242.

**6. Sufficiency of the evidence supporting breach of the Separation Agreement**

In his third issue, McCullough argues there is legally and factually insufficient evidence to support the jury's answer that he breached the Separation Agreement.[7] In section II.E of this opinion, we conclude the liability theory that affords SMA the greatest recovery is breach of fiduciary duty, not breach of contract. We therefore address the sufficiency challenge to the extent it relates to our rejection of the McCulloughs' contention that the existence of the Separation Agreement bars SMA's ability to recover restitution. *See City of Harker Heights, Tex.*, 830 S.W.2d at 319 (restitution appropriate remedy when agreement contemplated not fully performed). Our resolution of the McCulloughs' fifth issue obviates our need to address his factual sufficiency points. *See* TEX. R. APP. P. 47.1.

McCullough devotes his brief on this issue to his contention that he did not breach the Separation Agreement as a matter of law because "an insufficient amount of time had elapsed to warrant SMA's notice of cure under the terms of the Agreement and McCullough did not fail to comply within the stated time frame." He maintains that because the Separation Agreement does not contain a "time is of the essence" clause (only his agreement to "promptly" provide the Due Diligence Items), SMA's non-compliance notice sent just thirteen days after the parties signed the agreement is self-serving and contrary to the parties' intent under the agreement.

---

[7] He also asserts as part of his issue statement that the jury's answer regarding his "failure to satisfy conditions precedent" is not supported by legally or factually sufficient evidence, but he does not offer any argument in support of this assertion. So, we do not address it.

Regardless of McCullough's contention that SMA unilaterally imposed a date of performance when the agreement does not support such a date, the record contains more than a scintilla of evidence that McCullough actually never provided all the documents he promised to provide under the agreement, and this evidence is legally sufficient to support the jury's answer that he failed to comply with the contract. McCullough agreed to cooperate to accomplish the accounting and provide to SMA or SMA's CPA "all such information, records and documents" set forth on the exhibit listing the Due Diligence Items. Wilson testified that except for the request for McCullough's tax returns, the list of Due Diligence Items essentially mirrored the agenda Wilson provided McCullough at the October 31, 2008 meeting in which Wilson asked McCullough to provide documents for the reconciliation. Wilson testified that at the time he sent the non-compliance notice, all McCullough had provided were incomplete printouts from the bank website; Medlin said McCullough had provided only a "hodgepodge" of documents. For example, an exhibit admitted at trial of a bank statement McCullough provided in May 2009 shows page "6 of 9" for one account mixed with single pages of a bank statement for other accounts. Wilson explained that for an accounting, "[i]f there are nine pages in the bank statements, I wanted all nine pages." He also told McCullough that "bank statements" refers to the monthly bank statements and deposit slips and checks"; he testified that he needed the deposit slips and checks to verify the transaction. Wilson also testified that the "partial bank statements" provided by McCullough and his attorney in May 2009 covered three of McCullough's accounts but that there were a total of six accounts. Both Medlin and Wilson testified that SMA ultimately received the bank documents they needed after issuing a subpoena to the McCulloughs' bank. The bank provided the full monthly bank statements as well as deposit slips and canceled checks. There was no testimony or other evidence that McCullough was the one who provided the documents he agreed to provide in the agreement. The parties

testified that the issue of who owes who money was an outstanding issue at the time they entered into the agreement; the CPA Determination depended on McCullough's cooperation in providing documents.

The jury also heard McCullough's testimony in which he acknowledged that he did not deliver all the bank statements requested in the Due Diligence Items. McCullough specifically agreed to provide copies of any and all bank statements for a specific time frame "for any past, current or future account(s) in which deposits relating to any commissions or bonuses McCullough has received or will receive in connection with or arising from his sale of benefits/financial services." After reviewing the documents provided by the bank, Wilson found that $31,000 of the $137,401.13 in missing money had been deposited into the savings accounts for the McCulloughs' children. McCullough admitted he did not provide the records related to those accounts because it was an invasion of his privacy. He also admitted that had SMA not subpoenaed the records from the bank, Wilson would not have found the $31,000 of SMA's money that ended up in his children's accounts. In describing his performance in providing the Due Diligent Items, McCullough said he "tried his best" to turn over the items.

As the sole judge of the credibility of the witness, the jury was free to give little weight to McCullough's contention he tried his "best" to comply with the agreement and resolve the issue in SMA's favor. *City of Keller*, 168 S.W.3d at 819. And when we consider the evidence in the light most favorable to the jury's finding, we conclude there was more than a scintilla of evidence for the jury to find that McCullough did not comply with the Separation Agreement. *Id.* at 827.

### 7. Disposition of McCullough's Second and Third Issues

We conclude there is legally and factually sufficient evidence to support the jury's answers on SMA's claims for fraud, breach of fiduciary duty, and civil theft and the jury's award

of equitable disgorgement. Accordingly, we overrule McCullough's second issue. We also conclude the jury's answer related to McCullough's breach of the Separation Agreement is supported by legally sufficient evidence and overrule his third issue on this basis. As previously stated, we need not address the factual sufficiency challenge raised in McCullough's third issue.

## C. McCullough's challenges to the accounting and attorneys' fees awards

McCullough's fourth issue relates to the jury's awards of $36,541.17 in accounting fees and $172,438.53 in attorneys' fees to SMA. He complains these awards are not supported by legally or factually sufficient evidence.

### a. Accounting Fees

The jury found SMA incurred $36,541.17 in accounting fees to determine the amount of money McCullough had wrongfully retained. The jury found that amount as damages for McCullough's breach of the Separation Agreement, breach of his fiduciary duty, and fraud.

McCullough's first argument related to the award of accounting fees is a legal challenge, which he preserved in his motion for instructed verdict, rather than a sufficiency challenge. He argues SMA was not entitled to recover the accounting fees because SMA assumed the obligation for these fees under the Separation Agreement. McCullough bases his argument on this provision in the agreement: "SMA shall bear the cost of the CPA for the CPA Determination."

Wilson testified, however, that the work he performed for SMA to determine how much of SMA's money McCullough wrongfully retained was not the CPA Determination provided for in the Separation Agreement. The CPA Determination required Wilson to figure out the amount of Recovered Premiums and then reduce that amount by any sums owed to McCullough. Wilson did not perform the second calculation as a part of the services he completed for SMA. Nonetheless, the jury's award of accounting fees appears to take into account the fact that SMA

agreed to pay for the cost of the CPA Determination. Wilson estimated that had he done the CPA Determination, his fees would have been between $25,000 and $30,000. The jury's finding that SMA incurred $36,541.17 in accounting fees to determine how much money McCullough wrongfully kept was $25,000 less than the $61,541.17 in total fees Wilson billed SMA.

McCullough next argues that the accounting-fees award is not supported by legally or factually sufficient evidence because the evidence offered by SMA to support the recovery of the additional accounting fees was not based solely on accounting functions. McCullough claims the evidence shows that Wilson wrote the notice and cure letters, which were legal functions, not "necessary accounting functions," and that Wilson performed other non-accounting functions, such as attend business meetings, prepare a business plan and agenda, and engage in communications with McCullough following the October 2008 meeting about providing documents.

SMA sought as damages the "accounting fees incurred in ascertaining the amounts due to [SMA]." Those fees were for Wilson's services about which Wilson testified, and Wilson's bills detailing the services he provided were admitted as Plaintiff's Exhibit 90. The record shows that for Wilson to reconcile SMA's accounting records with McCullough's financial information to determine whether any money was owed, he necessarily had to collect and review the bank statements and other documents related to McCullough's accounts. He also had to have an understanding of the relevant provisions in the Separation Agreement, such as the CPA Determination outlined in paragraph 3 and the requirement that McCullough cooperate in providing the Due Diligence Items.

The notice and cure letters Wilson sent relate to his attempts to get the relevant data he needed to determine who owed who money. Similarly, McCullough's record citations for Wilson's services related to a "business plan" and "agenda" and communications with

McCullough were connected to the reconciliation of SMA's accounting records Wilson was trying to accomplish in 2008. Wilson testified he met with McCullough at the end of October 2008 to discuss the need for McCullough to provide certain financial information that was listed on the "agenda" so SMA could "sync everything up and make sure that all the income is being reported." Wilson also testified that he sent communications to McCullough to check on McCullough's progress in providing the requested documents. McCullough provides no analysis or argument for why these services did not constitute accounting functions or why the services would not be relevant to performing the reconciliation. *See* TEX. R. APP. P. 38.1(i). Nor does he provide insight into why an accounting function must be a "necessary accounting function" for SMA to be able to recover the extra money they spent in trying to ascertain the amounts McCullough owed. In addition, none of the charges listed on Plaintiff's Exhibit 90 are for services performed in 2008.

Finally, McCullough states that Wilson's "review and preparation of a report does not include the functions offered by SMA to support their additional accounting fees." To the extent McCullough is arguing that the fees Wilson incurred in preparing his expert report are not recoverable as a matter of law because expert-witness fees are not proper damages, we conclude this argument is not preserved. *See* TEX. R. CIV. P. 324(b); *United Parcel Serv., Inc. v. Tasdemiroglu*, 25 S.W.3d 914, 916 (Tex. App.—Houston [14th Dist.] 2000, pet. denied). McCullough did not complain about the accounting fees as expert-witness fees in his motion for instructed verdict, amended motion for judgment notwithstanding the verdict, or amended motion for new trial.[8]

We reject McCullough's attack on the jury's award of accounting fees and overrule his fourth issue to the extent it relates to accounting fees.

_____

[8] We express no opinion on whether the fees Wilson billed SMA in preparation for his expert report are proper damages.

### b. Attorneys' Fees

McCullough raises a factual sufficiency challenge to the jury's award of $172,438.53 in attorneys' fees. As will be discussed in more detail in section II.E of this opinion, however, SMA is not entitled to recover attorneys' fees in this case so we need not address this challenge. *See* TEX. R. APP. P. 47.1.

### D. McCullough's challenges to the exemplary damages award

In his sixth issue, McCullough raises several challenges to the jury's award of exemplary damages. He claims the award is not supported by legally or factually sufficient evidence, should be capped, and is excessive in violation of due process.

Under Texas Civil Practice and Remedies Code section 41.003(a), exemplary damages may be awarded "only if the claimant proves by clear and convincing evidence" that the claimant's harm for which it seeks recovery resulted from fraud, malice, or gross negligence. TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(a) (West 2008). "Clear and convincing" evidence is that "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 41.001(2). This standard of proof falls between the preponderance standard of proof of most civil proceedings and the reasonable doubt standard of proof of most criminal proceedings but with no requirement that the evidence be unequivocal or undisputed. *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979) (per curiam).

The jury awarded SMA $700,000 in exemplary damages after finding by clear and convincing evidence that the harm to SMA resulted from McCullough's malice or fraud. McCullough's first argument for why the award cannot stand relates to his sufficiency challenges to the jury's liability findings on SMA's claims for fraud, breach of fiduciary duty, and civil theft. He maintains that because the evidence is insufficient to support those findings, SMA is

–57–

not entitled to exemplary damages. We have already discussed in detail the evidence supporting the jury's findings related to the theory that McCullough committed fraud by non-disclosure, his conduct was a breach of his fiduciary duty, and he intended to deprive SMA of their money in violation of the Theft Liability Act and concluded the evidence was both legally and factually sufficient to support the jury's answers. So, this argument fails. *See Marin v. IESI TX Corp.*, 317 S.W.3d 314, 333–34 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (overruling appellant's challenge to sufficiency of evidence to support exemplary damages where court found sufficient evidence supporting jury's findings of fraud, forgery, and misapplication of fiduciary duty).

We recognize, however, that those conclusions were made under the review standard for findings proved by a preponderance of the evidence, a standard that permits us to use "any evidence that does not merely create surmise or suspicion" to show that something is more likely than not. *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 621 (Tex. 2004). But here, proof of the allegation must be clear and convincing, an elevated standard of proof that also must meet an elevated standard of review. *Id.*; *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 41.013.

McCullough asks us to reverse the exemplary damages award and render judgment that SMA take nothing on their claim for such damages because the jury's award of exemplary damages is not supported by legally or factually sufficient evidence. He claims the "element of fraud or malice necessary for the recovery of [exemplary] damages is not met in this case." And although he cites the requirement that the proof of exemplary damages must be by clear and convincing evidence, he offers only the following two sentences in support of his position: "any evidence of fraud or malice did not meet the clear-and-convincing burden of proof. In light of the Separation Agreement and the disclosures made during negotiations of the Agreement, the evidence is not capable of producing a firm belief or conviction of intent to defraud or deprive

–58–

SMA of the revenues due them." He provides no analysis explaining how the evidence heard by the jury does not meet the clear and convincing standard or explain why the Separation Agreement and related negotiations preclude a finding that SMA's harm resulted from McCullough's fraud or malice, especially in light of the fact that the complained-of conduct occurred before the parties entered into the Separation Agreement. These general assertions are inadequate to challenge the sufficiency of the evidence supporting the jury's exemplary damages award under the elevated standard of proof. The failure to adequately brief an issue by failing to specifically argue and analyze one's position waives any error on appeal. *In re M.A.S.*, 233 S.W.3d 915, 924 (Tex. App.—Dallas 2007, pet. denied). We therefore do not address these arguments and overrule this issue to the extent McCullough complains that the exemplary damages award is not supported by legally or factually sufficient evidence.

McCullough next argues that the trial court erroneously refused to apply the statutory cap to the exemplary damages award. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.008(b). Under section 41.008(b), an award of exemplary damages must not exceed an amount equal to the greater of (1) two times the amount of economic damages plus an amount equal to any noneconomic damages, not to exceed $750,000, or (2) $200,000. *Id.* The statutory cap does not apply to a cause of action against a defendant from whom a plaintiff seeks recovery of exemplary damages based on certain conduct described as a felony by the Texas Penal Code, if the conduct was committed knowingly or intentionally. *Id.* § 41.008(c) (listing seventeen penal code provisions). Relevant to McCullough's argument is the exception for conduct under chapter 32 of the penal code for misapplication of fiduciary property and chapter 31 for theft. *Id.* § 41.008(c)(10), (13). He claims that SMA failed to obtain jury findings that he violated these particular penal code provisions and without any jury findings to support uncapped exemplary damages, SMA is not entitled to an uncapped award.

We conclude the jury's findings that McCullough committed intentional theft of $137,401.13 supports application of the exception to the statutory cap on exemplary damages. *Id.* § 41.008(c)(13) (cap does not apply to conduct committed under chapter 31 of the penal code, "the punishment level for which is a felony of the third degree or higher"). In Question No. 7, the jury found that McCullough committed theft against SMA, and based on the affirmative answer to the theft question, the jury awarded SMA $137,401.13, which was the amount of money he unlawfully appropriated. The instruction accompanying the charge on the theft claim, quoted in section II.B.5 of this opinion, tracks the description of the offense in the penal code, *see* TEX. PENAL CODE ANN. § 31.03(a), (b), and the amount awarded by the jury for the theft raises the offense to the level of a second degree felony, *see id.* § 31.03(e)(6)(A) (offense is second degree felony if value of property stolen is between $100,000 and $200,000).

McCullough argues that SMA is required under section 41.008(c) to obtain a jury finding on the specific criminal code violation *and* a separate finding that the violation was committed knowingly or intentionally, citing *Signal Peak Enters. of Tex., Inc. v. Bettina Invs., Inc.*, 138 S.W.3d 915, 927 (Tex. App.—Dallas 2004, pet. struck). The intent element for theft under the penal code, however, was submitted as part of the jury question. *See* TEX. PENAL CODE ANN. § 31.03(a). And to the extent a separate question on the "knowingly or intentionally" element of section 41.008(c) is required, we will imply the finding to support it. *See* TEX. R. CIV. P. 279. The record does not show a request by McCullough for submission of a separate jury question on this element, and McCullough did not object to the missing question on this element.[9] He also has not challenged the sufficiency of the evidence on that element. Thus, based on the jury's

---

[9] The record shows that the parties had "many hours of charge conference off the record." Before the charge was read to the jury, the trial court gave the parties a chance to put their objections on the record, noting that "previously [the] objections were not on the record." The only objection put in the record by the McCulloughs related to the instructions at the beginning of the charge for "fee-based income."

–60–

finding that McCullough had engaged in the enumerated conduct (theft) under section 41.008(c), the trial court properly refused to apply the cap to SMA's exemplary damages award.

McCullough finally challenges the amount of the exemplary damages awarded, arguing that $700,000 is unconstitutionally excessive because the award exceeds the appropriate ratio of exemplary damages. In Question 22, the jury was instructed to consider the following statutory factors in determining the amount of exemplary damages to be assessed against McCullough: (1) the nature of the wrong; (2) the character of the conduct involved; (3) the degree of McCullough's culpability; (4) the situation and sensibilities of the parties concerned; (5) the extent to which such conduct offends a public sense of justice and propriety; and (6) McCullough's net worth. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.011(a). The jury also was instructed that exemplary damages may be awarded as "a penalty or by way of punishment." *See id.* §§ 41.001(5), 41.010(a). The determination of whether to award exemplary damages and the amount of exemplary damages lies within the discretion of the trier of fact. *Id.* § 41.010(b).

The Due Process Clause places outer limits on the size of a civil damages award. *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 276 (1989); *Bennett v. Reynolds*, 315 S.W.3d 867, 873 (Tex. 2010). An exemplary damages award that is "grossly excessive" offends "due process because it 'furthers no legitimate purpose and constitutes an arbitrary deprivation of property.'" *Bennett*, 315 S.W.3d at 873 (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417 (2003)). To determine whether an award is excessive in violation of due process, we a apply a three-part framework, referred to as the "*Gore*" guideposts: (1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between the harm or potential harm suffered by the victim and the exemplary damages award; and (3) the sanctions authorized and imposed in other cases for comparable misconduct. *Id.* (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574–75 (1996)). We conclude that

application of the guideposts at issue in this case—reprehensibility and the ratio between exemplary damages and compensatory damages—does not require us to reverse the exemplary damages award because it is grossly excessive.

The "reprehensibility" guidepost focuses on the "enormity" of the defendant's misconduct and involves consideration of five non-exclusive factors: whether (1) the harm inflicted was physical rather than economic; (2) the tortious conduct showed 'an indifference to or a reckless disregard for the health or safety of others'; (3) the target of the conduct had financial vulnerability; (4) the conduct involved repeated actions, not just an isolated incident; and (5) the harm resulted from intentional malice, trickery, or deceit, as opposed to a mere accident. *Id.* at 874 (quoting *Campbell*, 538 U.S. at 419). The reprehensibility analysis permits the court to consider related conduct that may be probative to the "deliberateness and culpability of the defendant's action" provided that the conduct has a nexus to the specific harm suffered by the plaintiff. *Id.* at 875 (quoting *Campbell*, 538 U.S. at 422). To some extent, we may also consider surrounding circumstances beyond the underlying tort. *Id.*

As discussed throughout this opinion, McCullough, as a trusted employee of SMA, engaged in conduct that resulted in the misappropriation of SMA's money. McCullough directed payment of SMA's commissions to him personally by changing payment instructions with carriers in a manner that was not in accordance with how SMA wanted the commissions directed. McCullough knew the commissions belonged to SMA and should be paid to SMA. When SMA discovered there was an issue with commission payments, they asked questions of McCullough and asked for his help in fixing the issue; SMA asked him for bank statements, access to accounts in which SMA's money was deposited, and for McCullough to set up instructions to have payments re-wired into SMA's bank accounts. Because of the way in which McCullough directed the commission payments, SMA did not have access to their cash (needed

to pay the expenses of the division, including employee salaries) and their financial records were inaccurate. SMA also was in the position of being out of compliance with the requirements of their fidelity bond. McCullough claims the fact that SMA's money repeatedly ended up in his personal accounts (including his children's accounts) was accidental. But instead of working with SMA to correct his "human error" and resolve the accounting issues, he stalled SMA's efforts for two years, continued receiving commission payments in a manner of which SMA disapproved, and ultimately resigned without ever cooperating in the reconciliation.

McCullough's related conduct of shopping the financial services book of business to SMA's competitors during the time SMA asked him to provide information and then selling the book of business to Frost when he had no authority to do so (despite his personal belief that although he was not a principal of SMA, paid no expenses to run the division, and did not own the accounts generated by the division, the book was his to shop because he brokered the accounts in his name) and hiding the fact of the sale from SMA for months showed his indifference to his duties as a fiduciary of SMA and additional intent to deceive SMA. *See Citizens Nat'l Bank v. Allen Rae Invs., Inc.*, 142 S.W.3d 459, 485 (Tex. App.—Fort Worth 2004, no pet.) (concluding evidence supporting jury finding of nondisclosures of facts were made with callous indifference justifying the award of exemplary damages). SMA had shouldered the burden of the losses of the division in the early years and paid the expenses for the division. Yet McCullough attempted to sell the division with the expectation that he could take the division with him because the clients were in his name.

The second guidepost looks at the ratio between the exemplary damages award and the compensatory damages award. *Bennett*, 315 S.W.3d at 877; *see also Gore*, 517 U.S. at 580–82 (exemplary damages must bear reasonable relationship to compensatory damages). Although the Supreme Court has declined to draw a mathematical bright-line ratio, the Court has said that "an

award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." *Campbell*, 538 U.S. at 425; *Bennett*, 315 S.W.3d at 877.

Using the damages assessed by the jury for the civil theft claim—$137,401.13 + $1,000—as a baseline, McCullough argues that the $700,000 exemplary damages award "results in more than a 5:1 ratio." In contrast, SMA argues the resulting ratio is less than a 4:1 ratio based on compensatory damages of $338,506.13 ($137,401.13 + the disgorgement remedy of $201,105). But the amount of actual damages found by the jury on SMA's theories of liability was $173,942.30, which represented the amount of money McCullough wrongfully retained ($137,401.13) and the fees incurred to determine how much he wrongfully retained ($36,541.17). Based on those actual damages, the ratio of exemplary damages to compensatory damages in this case is 4.02:1.

In *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 310 (Tex. 2006), the Texas Supreme Court concluded that a 4.33:1 ratio exceeded constitutional limits where only the fifth of the five reprehensibility factors favored the exemplary damages award. But here, at least three of the reprehensibility factors favor the award, and the 4:1 ratio was exceeded only slightly. *See Bennett*, 315 S.W.3d at 879 (noting that "rigid application of a 4:1 ratio is not universally required"). And keeping in mind that the amount of exemplary damages awarded ultimately lies within the discretion of the jury, which has assessed the witnesses' credibility and determined the weight to be given their testimony and to the evidence, we cannot conclude that the award of $700,000 is excessive. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.010(b). We overrule McCullough's sixth issue.

## E. Did the trial court enter a judgment in violation of the one-satisfaction rule?

In their fifth issue, the McCulloughs contend that even if SMA's extra-contractual and equitable claims are not barred by the release, the trial court erred in entering a judgment on all

of SMA's claims in violation of the one-satisfaction rule. They complain SMA was awarded duplicative damages under multiple theories of liability despite suffering only a single injury. The McCulloughs raised this issue in a post-trial motion to modify, correct, or reform the judgment, which the trial court denied. In this context, we review the trial court's judgment for an abuse of discretion. *Wagner v. Edlund*, 229 S.W.3d 870, 879 (Tex. App.—Dallas 2007, pet. denied).

A party may sue and seek damages on alternative theories of liability. *Waite Hill Servs., Inc. v. World Class Metal Works, Inc.*, 959 S.W.2d 182, 184 (Tex. 1998) (per curiam); *see also* TEX. R. CIV. P. 48. And "a judgment awarding damages on each alternate theory may be upheld if the theories depend on separate and distinct injuries and if separate and distinct damages findings are made as to each theory." *Madison v. Williamson*, 241 S.W.3d 145, 158 (Tex. App.—Houston [1st Dist.] 2007, pet. denied); *see also Birchfield v. Texarkana Mem'l Hosp.*, 747 S.W.3d 361, 367 (Tex. 1987). But for one injury, there can be only one recovery. *Utts v. Short*, 81 S.W.3d 822, 831 (Tex. 2002) (one-satisfaction rule); *see also Chapa*, 212 S.W.3d at 303–04. So, when a defendant's acts result in a single injury and the jury returns favorable findings on two or more theories of liability, the plaintiff "has the right to a judgment on the theory entitling him to the greatest or most favorable relief." *Boyce Iron Works, Inc. v. Sw. Bell Tel. Co.*, 747 S.W.2d 785, 787 (Tex. 1988).

The jury awarded identical economic damages—$137,401.13 for the amount McCullough misappropriated and $36,541.17 for the amount SMA spent trying to uncover the misappropriation—for each of SMA's liability theories (breach of contract, fraud, and breach of fiduciary duty).[10] The trial court awarded these amounts just one time in the judgment and then

---

[10] For SMA's civil theft claim, the jury awarded only the amount of money McCullough unlawfully appropriated, or $137,401.13.

also awarded SMA $1,000 in statutory damages, the $201,105 equitable disgorgement remedy, $700,000 in exemplary damages, and $172,438.53 in attorneys' fees.

While the judgment does not appear to award duplicative economic damages for SMA's alternate theories of liability, it does award various damage elements that arise under the different theories. For example, for breach of contract, SMA could recover economic damages and attorneys' fees but not exemplary damages, equitable disgorgement, or statutory damages. *Chapa*, 212 S.W.3d at 304. For fraud, SMA could recover economic and exemplary damages but not attorneys' fees, equitable disgorgement, or statutory damages. *Id.* SMA could recover economic and exemplary damages plus statutory damages and attorneys' fees for their civil theft claim but could not receive the equitable disgorgement remedy. TEX. CIV. PRAC. & REM. CODE ANN. §§ 134.003(a), 134.005(a), (b); *id.* § 41.008(b), (c)(13) (noting that damages awarded for felony theft in the third degree or higher under penal code are exempt from cap on exemplary damages). And under a breach-of-fiduciary duty theory, SMA could receive the equitable disgorgement remedy plus economic and exemplary damages but not attorneys' fees or statutory damages. *See W. Reserve Life Assurance Co. of Ohio v. Graben*, 233 S.W.3d 360, 377–78 (Tex. App.—Fort Worth 2007, no pet.); *Murphy v. Canion*, 797 S.W.2d 944, 949 (Tex. App.— Houston [14th Dist.] 1990, no writ).[11]

SMA argues they are entitled to recover all amounts awarded in the trial court's judgment because they suffered separate and distinct injuries. We disagree. Based on our review of SMA's pleadings and the record, it is clear that SMA's claims all concerned the same conduct by McCullough—his misappropriation of SMA's money. SMA was injured because McCullough wrongfully retained money that belonged to SMA and by having to pay extra accounting fees to

---

[11] In addition, a constructive trust may be imposed for a breach of fiduciary duty. *See Anderton v. Cawley*, 378 S.W.3d 38, 54 n.4 (Tex. App.—Dallas 2012, no pet.). We reject the McCulloughs' argument that the trial court erred by awarding both actual damages and a constructive trust on the same damages.

figure out how much money he owed. The rule is that if the plaintiff suffers only a single injury, it can recover only those damages authorized under the single *theory* that affords the greatest recovery. *Boyce*, 747 S.W.2d at 787; *see also Chapa*, 212 S.W.3d at 303–04; *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 335–36 (5th Cir. 2008) (applying Texas law and noting that prevailing parties may not "pick and choose" remedies from different sources to maximize relief). And when the prevailing party fails to elect between alternative measures of damages, "the court should utilize the findings affording the greater recovery and render judgment accordingly." *Birchfield*, 747 S.W.2d at 367; *see also* TEX. R. CIV. P. 301 (judgment should be "so framed as to give the party all the relief to which he may be entitled"). Here, that theory is breach of fiduciary duty.

Under a breach-of-fiduciary duty theory, SMA can recover economic and exemplary damages and receive an equitable disgorgement remedy, but they cannot simultaneously recover attorneys' fees or statutory damages. We conclude the trial court's judgment is erroneous to the extent it awards SMA attorneys' fees and statutory damages. We therefore sustain the McCulloughs' fifth issue and reverse that portion of the trial court's judgment that awarded SMA $1,000 in statutory damages and $172,438.53 in attorneys' fees and render judgment that SMA cannot recover those amounts.

## F. Whether the trial court's judgment erroneously contains a turnover order

In their final issue, the McCulloughs contend the trial court erred in granting turnover relief in its judgment (1) that is not supported by any pleading, evidence, or finding entitling SMA to that relief and (2) without requiring SMA to satisfy the requirements for turnover relief under Texas Civil Practice and Remedies Code section 31.002. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 31.002 (West 2008). This issue arises out of the trial court's denial of the

–67–

McCulloughs' motion to modify, correct, or reform the judgment, which we review for an abuse of discretion. *See Wagner*, 229 S.W.3d at 879.

As a part of the damages for their breach of fiduciary duty claim, SMA asked the court to impose a constructive trust "on all monies received by McCullough and/or Julia McCullough which rightfully belong to SMA." The jury found McCullough breached his fiduciary duty and that the McCulloughs had money in their possession that belonged to SMA. In the judgment, the trial court placed a constructive trust on amounts deposited into five bank accounts, with one account owned by the McCulloughs jointly and the remaining accounts owned by McCullough individually. The trial court ordered the McCulloughs "to *turnover* to [SMA]" the amount in the joint account "within 30 days of the date of this Final Judgment . . . ." (Emphasis added). And McCullough was ordered "to *turnover* to [SMA] the amounts in the other accounts listed . . . within 30 days of the date of this Final Judgment." (Emphasis added). The McCulloughs conceded in their motion to modify, correct, or reform the judgment that "the evidence at trial showed the amounts listed in the Judgment were deposited in to the respective bank accounts."[12]

We disagree with the McCulloughs' contention that the "turnover" language in the judgment constitutes a turnover order. A turnover order is a statutory, post-judgment collection procedural device used to assist judgment creditors reach assets of a judgment debtor that are difficult to attach or levy by ordinary legal process. TEX. CIV. PRAC. & REM. CODE ANN. § 31.002(a)(1); *Davis v. West*, 317 S.W.3d 301, 309 (Tex. App.—Houston [1st Dist.] 2009, no pet.). Under the statute, the judgment creditor can apply for aid from the court for an injunction or other means to satisfy a judgment through a judgment debtor's property. TEX. CIV. PRAC. & REM. CODE ANN. § 31.002(a). In contrast, a constructive trust is a remedial device that when

---

[12] They argued, however, that there was no evidence presented regarding whether such amounts remained in the accounts and claimed that had they been afforded the opportunity to present evidence, they would have established that many of the accounts no longer existed and were closed. Although the McCulloughs complained about the lack of opportunity to put on evidence regarding the accounts in a hearing before judgment was entered, they did not state why they were unable to present this evidence at trial.

imposed, subjects the one who holds title to the property to an equitable duty "to convey it to another, on the ground that his acquisition or retention of the property is wrongful and that he would be unjustly enriched if he were permitted to retain the property." *Cote v. Texcan Ventures II*, 271 S.W.3d 450, 453 (Tex. App.—Dallas 2008, no pet.) (quoting *Baker Botts, L.L.P. v. Cailloux*, 224 S.W.3d 723, 736 (Tex. App.—San Antonio 2007, pet. denied)). Here, the trial court signed a final judgment granting the relief requested by SMA—for a constructive trust placed on money identified to be held by the McCulloughs that belonged to SMA. The trial court's use of the "turnover" language in the judgment does not grant aid to SMA "through injunction or other means" to obtain satisfaction on the judgment. TEX. CIV. PRAC. & REM. CODE ANN. § 31.002(a). Rather, that language is part of the equitable remedy; it was the mechanism for the McCulloughs jointly and McCullough individually to restore the amounts covered by the constructive trust to SMA within a certain time frame. *See Cote*, 271 S.W.3d at 453. Indeed, this order requiring the McCulloughs to "turnover" the money belonging to SMA is appropriate given that the purpose of a constructive trust is to compel a judgment debtor to give back money it would be unjust for him to keep. *Id.* at 452–53. We therefore conclude the trial court did not abuse its discretion in denying the McCulloughs' motion to modify, correct, or reform the judgment on this ground. We overrule their seventh issue.

## IV. CONCLUSION

We conclude that portion of the trial court's judgment awarding SMA $1,000 in statutory damages and $172,438.53 in attorneys' fees should be reversed because the liability theory for which SMA receives the greatest recovery is breach of fiduciary duty for which such fees are not recoverable. We render judgment that SMA cannot recover those amounts.

We affirm the trial court's judgment in all other respects.

/Ada Brown/
ADA BROWN
JUSTICE

111303F.P05



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

ROBERT L. MCCULLOUGH AND JULIA T. MCCULLOUGH, Appellants

No. 05-11-01303-CV     V.

SCARBROUGH, MEDLIN & ASSOCIATES, INC. AND SCARBROUGH, MEDLIN & ASSOCIATES FINANCIAL SERVICES, INC., Appellees

On Appeal from the 416th Judicial District Court, Collin County, Texas
Trial Court Cause No. 416-02008-2009.
Opinion delivered by Justice Brown.
Justices FitzGerald and Lewis participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED** in part and **REVERSED** in part. We **REVERSE** that portion of the trial court's judgment awarding appellees Scarbrough, Medlin & Associates, Inc. and Scarbrough, Medlin & Associates Financial Services, Inc. $1,000.00 as statutory damages and $172,438.53 in attorneys' fees and **RENDER** judgment that appellees cannot recover those amounts. In all other respects, the trial court's judgment is **AFFIRMED**.

It is **ORDERED** that appellees Scarbrough, Medlin & Associates, Inc. and Scarbrough, Medlin & Associates Financial Services, Inc. recover their costs of this appeal and the amount of the trial court's judgment from appellants Robert L. McCullough and Julia T. McCullough and from the cash deposit in lieu of cost bond. After all costs have been paid, the clerk of the District Courts of Collin County, Texas is directed to release the balance, if any, of the cash deposit to Julia T. McCullough.

Judgment entered this 20th day of June, 2014.

/Ada Brown/
_____
ADA BROWN
JUSTICE